**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-4644
_____

MARTIN A. ROMAN,

Appellant

v.

DAVID DIGUGLIELMO, Superintendent;
PENNSYLVANIA BOARD OF
PROBATION AND PAROLE; THE DISTRICT
ATTORNEY OF THE COUNTY
OF PHILADELPHIA; THE ATTORNEY GENERAL OF
THE STATE OF PENNSYLVANIA

_____

On Appeal from the District Court
for the Eastern District of Pennsylvania
(No. 2:05-cv-05771)
District Judge: Honorable Anita B. Brody
_____

Argued on October 5, 2011

Before: McKEE, *Chief Judge*, FUENTES and GREENBERG,
*Circuit Judges*

(Opinion Filed: April 4, 2012)

Mary Gibbons, Esq.          **(ARGUED)**
600 Mule Road, #16
Toms River, NJ 08757

    *Attorney for Appellant*

William H. Ryan, Jr.
Claudia M. Tesoro          **(ARGUED)**
Calvin R. Koons
John G. Knorr, III
Office of the Attorney General
21 South 12th Street, 3d Floor
Philadelphia, PA 19107

    *Attorneys for Appellees*

---

OPINION OF THE COURT

---

Fuentes, *Circuit Judge*:

Martin Roman was convicted of indecent assault and corruption of a minor, both crimes involving his daughter, and is currently a prisoner of the Pennsylvania Department of Corrections. As part of his sentence, the State of Pennsylvania recommended that Roman participate in a sex offender treatment program. In order to do so, he is required to admit that he committed the sex crime for which he was convicted. Roman has refused to participate in the program because, he contends, any such admission would constitute compelled self-incrimination in violation of the Fifth Amendment and would have compromised his then-pending appeal of his sex offense conviction. Based on his refusal to participate, Roman repeatedly has been denied parole. The primary issue before us is whether the State's decision to deny Roman parole, unless he admits his guilt and participates in the sex offender treatment program, violates his Fifth Amendment right against self incrimination. We hold that it does not.

## I.

In 1977 a jury found Roman guilty of two counts of third-degree murder. He received an aggregate sentence of 15-30 years. Roman was released on parole in 1992, shortly after his minimum release date. Eight years later, while still on parole for the homicide conviction, Roman was accused of inappropriately touching his six-year-old daughter. He was charged with endangering the welfare of a child, corruption of a minor, unlawful restraint, simple assault, recklessly endangering another person, false imprisonment, and indecent assault.

3

Ultimately, Roman was convicted of indecent assault and corruption of a minor in 2001, and was sentenced to serve 16-32 months in a state correctional facility, to be followed by two years' probation. The sentencing report recommended that he serve his sentence at a facility offering treatment for "Sexual Offenders and Abusers."

Following Roman's 2001 conviction, the Pennsylvania Board of Probation and Parole (the "Board") met and determined that Roman's conduct violated the terms of his parole from his homicide conviction. The Board ordered him to serve backtime and the remainder of his sentence for murder, pending parole, prior to beginning his sentence for his 2001 conviction. The Board's decision stated that, "[w]hile confined, [Roman] must comply with the institution's prescriptive program requirements and have no misconducts. [Roman] must participate in sex offender treatment." (App. 74.) Pennsylvania's sex offender treatment program requires that an inmate admit guilt for the offending conduct in order to participate. Roman says that he refused to participate because admitting his guilt could have jeopardized his then-pending appeal of his conviction for indecent assault and corruption of minors.

The Board first denied Roman parole in August 2003, following a hearing. In its decision, the Board considered Roman's version of the nature and circumstances surrounding his homicide offense,[1] his prior history of parole failure, and his unacceptable compliance with the sex offender treatment

---

[1] It appears from the record that Roman continued to maintain that the homicides for which he was convicted in 1977 were acts of self-defense.

program prescribed to him in his sentencing. The Board stated that in Roman's next review it would consider "whether [Roman had] participated in/successfully completed a treatment program for: sex offenders" and whether prison officials still recommended him for parole. (App. 84.)

The Board denied Roman parole a second time in August 2004, citing the same factors it relied on in its 2003 decision. It again listed Roman's failure to complete the prison sex offenders program as one of the bases for its decision, and again stated that it would consider whether he had completed the program as part of its next review of his eligibility for parole.

Roman sought review of these parole denials in the Commonwealth Court of Pennsylvania, requesting a writ of mandamus directing the Board to "correct [its] misapplication of the law." (App. 88.) The Court dismissed his petition, finding that the Board had acted within the scope of its discretion. *Roman v. Pennsylvania Board of Probation and Parole*, No. 682 M.D. 2004 (Pa. Commw. Ct. Dec. 13, 2004). The Pennsylvania Supreme Court affirmed that decision the following year. *Roman v. Pa. Bd. of Probation & Parole*, 881 A.2d 1263 (Pa. 2005). Roman did not assert a Fifth Amendment claim during either of those proceedings.

In November 2005, Roman filed a pro se petition for habeas corpus in the Eastern District of Pennsylvania, arguing that the Board "violate[d the] constitutional . . . protections of the *ex post facto* clause when it ordered Mr. Roman to participate in a sex offender program before considering his parole application of the 1977 conviction in violation of the Fifth and Fourteenth Amendments." At the time he filed his petition, Roman's appeal of his 2001 conviction for indecent

5

assault and corruption of minors was still pending in state court.[2]

Roman's petition was assigned to a Magistrate Judge, who issued a Report and Recommendation stating that Roman had failed to exhaust his claims in state court, as required under federal habeas law. In the alternative, he found that Roman's petition failed on the merits. The Magistrate Judge interpreted Roman's claim as an *ex post facto* challenge and determined that, because Roman could not demonstrate that a change in the law governing Pennsylvania parole decisions had affected his sentence, his claim failed.

---

[2] Roman's appeal of his 2001 state court conviction for indecent assault and corruption of a minor was denied in February 2006, rendering his conviction final. No party has suggested that this renders this case moot. Indeed, Roman remains incarcerated and subject to the demands of the Board. Assuming, *arguendo*, that Roman can show that the Board's actions were unconstitutional and affected the length of time he was required to remain incarcerated for his first sentence for murder, our decision here would affect the length of time remaining on that sentence and his release date. *DeFoy v. McCullough*, 393 F.3d 439, 442 (3d Cir. 2005); *cf. United States v. Kissinger*, 309 F.3d 179, 181 (2002) (stating that an inmate who has been unconditionally released from prison must demonstrate collateral consequences continuing from the constitutional injury, lest her claim be rendered moot).

In response, Roman filed an objection to the Magistrate Judge's Report and Recommendation, more fully articulating that the conditions on his parole were problematic because, in order "to participate in a sex offender program, which requires admission of the crime as a stepping stone for admission [into the program]," Roman would be "require[d] . . . to waive his Fifth Amendment[] rights against self incrimination." (App. 13.) Roman objected that he could not waive those rights because he had yet to exhaust his challenges to his 2001 state court conviction. Notwithstanding Roman's objections, the District Court adopted the Magistrate Judge's Report and Recommendation and denied Roman's habeas claim.

In May 2007, this Court issued a certificate of appealability pursuant to 28 U.S.C. § 2253(c) on two issues: (1) "whether [Roman] ha[d] exhausted his claim that the denial of parole based on his failure to complete the sex offender treatment program violates his Fifth Amendment right against self-incrimination with respect to a conviction that is not final; and (2) if so, whether the denial of parole violated [Roman's] right against self incrimination with respect to the conviction that was not final."

## II.

The District Court exercised jurisdiction over Roman's claims under 28 U.S.C. § 2254. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

Where, as here, a district court dismisses a habeas petition without first holding an evidentiary hearing, our review is plenary. *Palmer v. Hendricks*, 592 F.3d 386, 392 (3d Cir. 2010). We review de novo all questions of law, and

7

consider all factual allegations in a light most favorable to the petitioner to determine whether he has stated a cognizable claim for habeas relief. *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 291 (3d Cir. 1991). We then determine whether an evidentiary hearing is necessary to develop the facts before us. *Id.*

## III.

### A. Exhaustion Requirement

A federal court may not review a petition for writ of habeas corpus "unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State, or shows that doing so would be futile because state procedures are unavailable or ineffective." *DeFoy v. McCullough*, 393 F.3d 439, 442 (3d Cir. 2005) (quoting 28 U.S.C. § 2254(b) (internal quotation marks omitted)). In order to satisfy the futility exception to the exhaustion requirement, a petitioner must show that the state remedy is so "clearly foreclosed" by state law that we can "conclude with certainty" that state courts afford no recourse for the claim. *Lines v. Larkins*, 208 F.3d 153, 165, 163 (3d Cir. 2000). Where, however, a petitioner has failed to raise his claims in state court and we find that some state process is available to address those claims, notions of federalism and comity require that we dismiss the habeas petition. *DeFoy*, 393 F.3d at 442.

Alternatively, we may bypass the exhaustion issue altogether should we decide that the petitioner's habeas claim fails on the merits. 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007).

8

Roman now argues that the exhaustion requirement is no bar to his claim because, as this Circuit recognized in *DeFoy*, 393 F.3d 439, Pennsylvania law affords no remedy for claims challenging the constitutionality of a denial of parole. Thus, he argues, any attempt to raise his argument in state court would have been futile. [3] In response, the State argues that *DeFoy* no longer controls because Commonwealth Courts since that decision have adjudicated mandamus actions involving parole denials by the Board and have considered constitutional claims other than *ex post facto* claims.

Because we will deny Roman's claims on the merits, we need not address the issue of exhaustion in this case. However, we pause to note that, to the extent there has been

---

[3] In *DeFoy*, faced with a habeas petition similar to Roman's, a district court dismissed the petitioner's Fifth Amendment claims against the parole board as unexhausted because DeFoy could have first filed a petition for a writ of mandamus in the Pennsylvania state courts. 393 F.3d at 441. We reversed, reading Pennsylvania's case law up to that point to permit prisoners challenging the denial of parole to seek writs of mandamus, but only under the *ex post facto* clause, and not on other constitutional grounds. *See id.* at 444 (quoting *Coady v. Vaughn*, 770 A.2d 287, 290 (Pa. 2001) ("Absent a change in the statutes governing parole, . . . denial of parole would generally constitute a discretionary matter that is not subject to review.")). Therefore, we held that "a Pennsylvania state prisoner challenging the denial of parole need not file a petition for a writ of mandamus in order to satisfy the dictates of exhaustion." *Id.* at 444.

any shift in Pennsylvania law, we cannot comfortably say that it is clear enough to alter our decision in *DeFoy*.[4]

## B. Fifth Amendment Claim

The Fifth Amendment, as incorporated and made applicable to the states through the Fourteenth Amendment, provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. Though a prisoner already may have been convicted and imprisoned for an offense, the Fifth Amendment still applies to ensure that the individual not be compelled to bear witness against himself or to divulge information that might

---

[4] The availability of Pennsylvania mandamus review for inmates challenging the denial of their parole on non-*ex post facto* grounds remains unsettled. Though certain courts since *DeFoy* have demonstrated some willingness to consider constitutional claims outside the *ex post facto* context, none have addressed or acknowledged the language that drove our reading of *Coady*. *See Nieves v. Pa. Bd. of Prob. & Parole*, 995 A.2d 412, 418 (Pa. Commw. Ct. 2010) (substantive due process and *ex post facto*); *Wilson v. Pa. Bd. of Prob. & Parole*, 942 A.2d 270 (Pa. Cmwlth. Ct. 2008) (Fifth Amendment in context of sexual offender rehabilitation program); *Dodgson v. Pa. Bd. of Prob. & Parole*, 922 A.2d 1023, 1026 (Pa. Commw. Ct. 2007) (due process, equal protection, Fifth Amendment, court access and *ex post facto*); *Nickson v. Pa. Bd. of Prob. & Parole*, 880 A.2d 21, 13 (Pa. Commw. Ct. 2005) (Eighth Amendment). *But see Nieves*, 995 A.2d at 421-22 (Leavitt, J., concurring) (citing *Coady* for the proposition that "mandamus will not lie" in challenges to the denial of parole and arguing that the court need not have considered the claims before it at all).

incriminate him in future criminal proceedings. *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984). An individual trying to make out a Fifth Amendment claim must demonstrate two key elements: compulsion and use. *Id.*

Roman argues that the Board's decisions requiring that he participate in the sex offender rehabilitation program violated his right against self-incrimination under the Fifth Amendment, since the Board effectively compelled him to choose between admitting his guilt for a sexual offense—a requirement for admission to the program—and relinquishing his opportunity for parole. Roman further argues that, at the time he filed this petition, his conviction for the sex offense was not yet final and thus any admission he made could be used against him in that appeal or in any future proceedings. The State responds that Roman has not demonstrated a Fifth Amendment violation because the consequences of his refusal to participate in the program are not severe enough to constitute compulsion under the Fifth Amendment. Further, it argues that Roman is unable to show that his statements were or would have been used against him in a criminal proceeding, had he decided to participate in the program.

The record before us is not clear as to the extent to which Roman's refusal to participate in the program was the sole or primary cause of the Board's repeated refusal to grant him parole. In each Board letter, it is listed as one among several reasons for denying him parole, including his history of previous failures under supervised release. However, even assuming *arguendo* that the Board's refusal was the sole driver of its decisions to refuse Roman parole, we hold that the actions of the Board do not amount to "compulsion" within the meaning of the Fifth Amendment.

11

Though the privilege against self-incrimination "does not terminate at the jailhouse door," it is well established that a "broad range of choices that might infringe constitutional rights in a free society fall within the expected conditions of confinement of those who have suffered a lawful conviction." *McKune v. Lile*, 536 U.S. 24, 36 (2002) (plurality opinion) (Kennedy, J.). Thus, in circumstances such as these, where a prisoner's liberties are already curtailed as a necessary and essential element of his incarceration, that prisoner faces unique challenges in demonstrating that a particular penalty or punishment inflicts a constitutional injury upon him. In the context of the Fifth Amendment, specifically, compulsion is the linchpin of any such claim.

Where, as here, a prisoner argues that the consequences of his refusal to participate in a prison program that requires him to admit guilt violate the Fifth Amendment, we must ask "whether the State's program, and the consequences for non-participation in it, combine to create a compulsion that encumbers" that prisoner's right against self-incrimination. *Id.* at 35. Though drawing the distinction between a lawful condition of confinement and a condition that impermissibly encumbers a prisoner's rights can be challenging, it is a distinction that rests on the difference between merely pressuring or encouraging an inmate to incriminate himself, and compelling him to do so through the threat of consequences so "grave" as to leave him no choice at all. *See id.* at 50 (O'Connor, J., concurring).

The Supreme Court outlined the contours of this analysis in *McKune v. Lile*, 536 U.S. 24 (2002). In that case Lile, a convicted sex offender, brought a Fifth Amendment challenge to Kansas' compulsory sex offender program, which required him to admit guilt for his crime of

12

incarceration as well as any previous sex crimes. *Id.* at 29. Under the Kansas program, any such admissions were not privileged and could be used in future criminal proceedings. *Id.* at 30. Lile, who was convicted of rape but had maintained all along that the encounter was consensual, refused to admit guilt and faced losing substantial prison privileges as a result. In particular, prison officials threatened to restrict his visitation rights, earnings, prison job opportunities, and ability to send money to his family. Lile was also told he would be moved to a maximum-security prison, which necessarily entailed less comfortable living conditions and housed more dangerous inmates, in order to make room for prisoners who were willing to participate in the program. *Id.* at 30-31.

In a fractured opinion, a plurality of the Court agreed that Lile—though faced with a difficult choice between asserting his right to remain silent and receiving the benefits and comforts of the prison conditions then afforded to him— had failed to demonstrate that the reduction in his prison privileges rose to the level of compulsion proscribed under the Fifth Amendment. *Id.* at 46-48. The plurality opinion, authored by Justice Kennedy, distinguished the punishment meted against Lile from the "so-called penalty cases" in which the Court had previously held that consequences involving the loss of employment or professional reputation were sufficient to constitute compulsion under the Fifth Amendment. Those cases, the plurality wrote, involved free citizens, not already subject to the limitations of prison life, and were thus "not easily extended to the prison context." *Id.* at 40 (citing *Garity v. New Jersey*, 385 U.S. 493 (1967); *Spevak v. Klein*, 385 U.S. 511, 516 (1967)). Instead, the plurality applied a very stringent test that required that the

13

inmate demonstrate the imposition of "atypical and significant hardships on [inmates] in relation to the ordinary incidents of prison life." *Id.* at 37 (adopting the test for due process claims established in *Sandin v. Conner*, 515 U.S. 472 (1995)). In effect, the plurality's test limited compulsion to instances not served by a legitimate penal interest, where the punishment actually lengthened a prisoner's sentence or altogether denied him eligibility for good-time credits or parole. *Id.* Justice Stevens, joined by Justices Souter, Ginsburg and Breyer, dissented, urging that the Court adopt a much broader test which recognized that the threat of revoking privileges was sufficient to trigger the Fifth Amendment, absent some grant of immunity assuring that the statements could not be used against the prisoner. *McKune*, 536 U.S. at 59, 69-70 (Stevens, J., dissenting).

Justice O'Connor, whose opinion controls,[5] concurred on narrow grounds, agreeing with the plurality's judgment that Lile's Fifth Amendment claim failed but agreeing with the dissent that "the Fifth Amendment compulsion standard is broader than the 'atypical and significant hardship' standard [the Court had] adopted for evaluating due process claims in prisons." *Id.* at 48 (O'Connor, J., concurring).

---

[5] *Marks v. United States*, 430 U.S. 188 (1977); *see also United States v. Naranjo*, 426 F.3d 221, 231 (3d Cir. 2005) (When "no one view garners a majority of the Justices . . . the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." (internal quotation marks and citations omitted)).

Justice O'Connor did not, herself, state a particular test for determining what degree of penalty amounts to compulsion in the prison context. She noted, however, that a proper inquiry should "recognize that it is generally acceptable to impose the risk of punishment, however great, so long as the actual imposition of such punishment is accomplished through a fair criminal process" and so long as it stops short of punishments such as "longer incarceration or execution"—penalties that "would surely implicate a 'liberty interest.'" *Id.* at 53, 52 (citing *McGautha v. California*, 482 U.S. 183, 213 (1971)). Importantly, under Justice O'Connor's analysis, the "Fifth Amendment does not prohibit all penalties levied in response to a person's refusal to incriminate himself or herself . . . . Not all pressure necessarily 'compels' incriminating statements." *Id.* at 49; *see also Ohio v. Woodward*, 523 U.S. 272, 286 (1998) (noting in the context of voluntary clemency hearings that "it has never been suggested that such pressures constitute 'compulsion' for Fifth Amendment purposes"); *McGautha*, 402 U.S. at 213 (noting that a criminal defendant is often faced with "the making of difficult judgments as to which course to follow" but that "the Constitution does not . . . always forbid requiring him to choose").

Though the prison in *McKune* threatened to restrict Lile's privileges and transfer him to less comfortable accommodations, Justice O'Connor found it instructive that he would still be provided with basic necessities—food and shelter, and would still "retain[] the ability to see his attorney, his family, and members of the clergy." *McKune*, 536 U.S. at 51. Nor had Lile shown that the consequences of his refusal to incriminate himself were more restrictive than the same sanctions applied to discipline any inmates who refused to

15

comply with any number of prison requirements, or that that the transfer to another prison would result in bodily harm. *Id.* Instead, because Lile's confinement already, by definition, subjected him to such conditions, the consequences of his refusal to speak were punishments within the scope of his conviction, rather than "stark[] . . . government attempts to compel testimony." *Id.* at 53; *see also id.* at 50 (distinguishing penalties imposed upon Lile from the more severe penalties inflicted on individuals outside the context of the prison environment).

There is no precedent in our Circuit that interprets or applies *McKune*, or that governs the case before us. Since *McKune*, several of our sister circuits have confronted cases similar to the one at hand, and have faced the challenge of interpreting and applying that decision to the facts before them. However, to the extent these circuits have attempted to articulate a standard that governs these cases, the results have been varied.[6] In *Ainsworth v. Stanley*, the First Circuit, noting that *McKune* provided "no clear guideposts," "resort[ed] to [its] own sound judgment" in denying the Fifth Amendment claim before it. 317 F.3d 1, 4 (1st Cir. 2002). The court adopted its own pre-*McKune* test, which it found consistent with that decision, and evaluated whether the burden imposed by the sex offender treatment program was

_____

[6] Notably, some have taken *McKune* at face value, relying on factual comparisons alone in reaching a conclusion. *See, e.g.*, *Reed v. McKune*, 298 F.3d 946 (10th Cir. 2002) (relying solely on comparison with facts in *McKune* in dismissing a similar case levied against the same rehabilitation program evaluated in *McKune*); *Searcy v. Simmons*, 299 F.3d 1220 (10th Cir. 2002) (same).

16

"unreasonable" in light of the state's interest and the availability of other, less burdensome means of achieving that interest. *Id.* at 5 (dismissing Fifth Amendment claim involving New Hampshire's sex offender treatment program). In contrast, in *United States v. Antelope*, the Ninth Circuit stated that "the status of the person claiming the Fifth Amendment privilege" or the "severity of the penalty imposed" are not, alone, determinative. 395 F.3d 1128, 1137 (9th Cir. 2005). Instead, it placed a premium on the state's purpose in imposing the penalty and on the extent to which the penalty went beyond that already imposed by fair criminal process. *Id.* at 1137 (finding Fifth Amendment violation where District Court actually lengthened term of probationer's supervised release based on his refusal to submit to repeat polygraph tests asking whether he had engaged in prohibited sexual conduct).

Thus, in light of the lack of clear consensus from other circuits and because Justice O'Connor's controlling opinion in *McKune* stops short of articulating its own test, we are tasked with the responsibility of distilling the core principles of that decision. To that end, we note that three things are abundantly clear:

First, a state program that requires an inmate to incriminate himself solely for the purposes of gathering incriminating statements against him will not pass constitutional muster. While the conditions inherent to imprisonment may alter our definition and application of "compulsion" under the Fifth Amendment, a state wielding its control over an inmate solely as "mere subterfuge for the conduct of a criminal investigation," is the very sort of conduct that the Fifth Amendment is intended to prohibit. *McKune*, 536 U.S. at 34; *id.* at 41 (discussing "elaborate

17

attempt" to avoid Fifth Amendment protections); *id.* at 53 (O'Connor, J., concurring) (distinguishing Kansas' program from "stark[] . . . government attempts to compel testimony"); *id.* at 68 (Stevens, J., dissenting) (conceding that the state's interest in rehabilitation is persuasive, but arguing that the state's need does not justify overriding Fifth Amendment protections). Thus, the statement sought—whether the inmate decides to speak or to remain silent—must be tethered to some independent, legitimate state purpose, such as rehabilitating inmates convicted of certain crimes. The more attenuated the relationship between the two, the greater our concern that the penalty is indicative of a state attempt to wield its power in an impermissible manner.

Second, it is undisputed by the plurality, the concurrence and the dissent that, in the event the penalty imposed does amount to an atypical and significant hardship on the petitioner's prison conditions, that penalty is sufficiently compelling to constitute a Fifth Amendment violation. While the plurality opinion treats this standard as the minimum showing necessary under the Fifth Amendment, *id.* at 37, both Justice O'Connor and the dissent advocate for a more flexible, permissive standard, albeit to varying degrees. *Id.* at 48-49 (O'Connor, J., concurring); *id.* at 59, 69-70 (Stevens, J., dissenting). It thus stands to reason that a prisoner who demonstrates that the consequences of his refusal to incriminate himself inflict an atypical and significant hardship on the conditions of his incarceration has made a sufficient, though not a necessary, showing under the Fifth Amendment.

Third, and relatedly, in light of Justice O'Connor's opinion, it is clear that there exists some realm of penalties just short of those that amount to atypical and significant

18

hardships, which, given the context, are sufficient to constitute compulsion. The distinction between an impermissible penalty and a mere consequence requires that we examine the penalty assessed in light of the conditions and restrictions already incumbent on the confinement itself. *Id.* at 51 (O'Connor, J., concurring).

Thus, under *McKune*, those penalties that merely alter the degree of comfort or freedom that an inmate is afforded, within the context of his confinement, but that otherwise remain within the permissible bounds of the inmate's prescribed sentence, are differences in measure alone and thus do not amount to compulsion under the Fifth Amendment. *See id.* at 51-54. In contrast, penalties that go beyond the mere "unpleasant" and are different in kind than those conditions of confinement imposed on all prisoners—that strike at the core of an inmate's recognized entitlements, that threaten his bodily safety, or that impose additional punishment beyond that already imposed by fair judicial process—constitute impermissible compulsion under the Fifth Amendment. *Id.* at 51.

In light of this analysis, Roman's Fifth Amendment claim fails because the consequence he faces—the repeat denial of parole for refusing to participate in the sex offender rehabilitation program—does not rise to the level of compulsion necessary to violate the Fifth Amendment.

Roman has no right or entitlement to parole under Pennsylvania law. *Commonwealth v. Brittingham*, 275 A.2d 83, 85 (Pa. 1971). His sentence has not been lengthened, nor have the actual conditions of his imprisonment been altered. *Cf. Antelope*, 395 F.3d at 1138 (finding it determinative that defendant was "sentenced to a longer prison term for refusing

to comply with [the rehabilitation program's] disclosure requirements"). At most and reading the facts he has plead in his favor, Roman—in deciding to assert his right to remain silent and thereby refusing to participate in the sex offender rehabilitation program—has forfeited his opportunity for early release on his 1971 murder sentence, the terms of which were imposed following full and fair criminal proceedings. *See McKune*, 536 U.S. at 53 (O'Connor, J., concurring); *Searcy*, 299 F.3d at 1226 (describing loss of good-time credits, which are permissive but not guaranteed, as a loss of an "opportunity" for early release); *see also Ohio v. Woodward*, 523 U.S. at 286-88 ("It is difficult to see how a voluntary interview could 'compel' respondent to speak . . . . [The] pressure to speak in the hope of improving his chance of being granted clemency does not make the interview compelled."). Nor is the penalty itself unique in its nature or severity: An inmate in Pennsylvania may be denied parole for many forms of misbehavior or violation of prison policies, all of which are designed to ensure order in the prison or to further the state's legitimate interest in rehabilitation. *See McKune*, 536 U.S. at 52 (O'Connor, J., concurring) (drawing a distinction between typical sanctions and those sanctions so unique as to arise to a higher level of coercion).

Moreover, the nature of the penalty in this case is in no way suggestive of the "stark[] . . . government attempts to compel testimony" relied on by previous cases in fleshing out the scope of the Fifth Amendment. *Id.* at 53. Though the Board refused Roman parole, that consequence flowed naturally from his decision not to participate in an established prison program designed to further Pennsylvania's legitimate interest in rehabilitating inmates, such as Roman, who have been convicted of sexual offenses. *Id.*; *see also id.* at 37-38

20

(Kennedy, J.) (discussing state's legitimate interest in compelling inmate participation in rehabilitative programs); *Ainsworth v. Stanley*, 317 F.3d 1, 5 (1st Cir. 2002) (same). Whether we view the Board's focus on Roman's participation in the program as a measure of his fitness for parole, or as a condition of parole, it stands to reason that a state may offer an incentive for participation in such rehabilitative programs—here, the opportunity for early release—without obligating itself to reward an inmate who chooses not to participate because he considers that reward outweighed by the cost. *Cf. Allison v. Snyder*, 332 F.3d 1076, 1080 (7th Cir. 2003) (noting, in context of similar § 1983 claim that prisoners can refuse to participate in the treatment program, and that "[t]his may make it harder to show that their problems are behind them, that release is in order, and that the criminal charges should be dismissed, but this does not make the choice any less willing or intelligent" (citing *United States v. Klotz*, 943 F.2d 707, 710-11 (7th Cir. 1991))).

While we do not dispute that Roman was, in this case, presented with an exceedingly difficult choice, the law is clear that it is a choice he may be forced to make. We therefore hold that Roman's Fifth Amendment claim fails on the merits.

**IV.**

For the reasons stated above, we will affirm the District Court's order dismissing Roman's habeas petition.