**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 23-3018
_____

JAMEICE NASH,
                            Appellant

v.

SUPERINTENDENT HOUTZDALE SCI;
DISTRICT ATTORNEY PHILADELPHIA;
ATTORNEY GENERAL PENNSYLVANIA

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:20-cv-04431)
District Judge:  Honorable Wendy Beetlestone

_____

Submitted under Third Circuit L.A.R. 34.1(a)
on May 22, 2025

Before: PHIPPS, CHUNG and ROTH, *Circuit Judges*

(Opinion filed:  December 8, 2025)

_____

OPINION*
_____

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

**ROTH**, *Circuit Judge*

Jameice Nash[1] was convicted of slitting his daughter's neck with a kitchen knife. He now alleges that Pennsylvania suppressed disciplinary records that could have helped impeach an officer who testified at his trial. But that officer's testimony was both relatively inconsequential and heavily corroborated. The impeachment value of those disciplinary records is marginal at best. We will therefore affirm the District Court's order denying Nash's petition for habeas corpus.

**I.**

On the morning of June 12, 2013, Monica Baker-Henry called 911 to report that her son, Jameice Nash, was acting erratically. She told the operator that her son appeared to be under the influence of a drug she believed was called "wet,"[2] and that she had locked herself in her room to place the 911 call. She further told the operator that:

> He has the baby with him. He's about to take her to school, but he has a knife. He is demanding to see the baby's mother. Him and the baby's mother are have [*sic*] something is going on, and I think the baby's mother busted up his lip, and he is saying he is going to -- inaudible -- he has a knife. Please approach carefully, because I don't want the baby to get hurt.[3]

Philadelphia police arrived at Baker-Henry's residence shortly afterwards and found Nash standing outside with his seven-year-old daughter R.H., whose neck had been slashed open. One of the officers at the scene took Nash into custody, while another officer rushed

---

[1] Appellant's first name is spelled throughout his state court record as "Jamice." In this proceeding, he has consistently spelled it "Jameice," so we will do the same.
[2] "Wet" is commonly used as "street-language for PCP [phencyclidine]." *See United States v. Gaines*, 918 F.3d 793, 798 (10th Cir. 2019).
[3] *See* Supplemental Appendix (SA) 183.

R.H. to a local hospital. According to medical records, R.H. "presented with a ten-centimeter laceration" which "[c]ut through the skin and muscle layers, as well as fat."[4] R.H. informed hospital staff that "her father kicked her mother out of the house then threatened to kill her, and put the knife up to her neck."[5] She later said that the cut was accidental, but then reported that "her father told her, hurry up, you'll be late for school or I'll kill you" before retrieving a knife and cutting her neck.[6] Doctors succeeded in surgically repairing R.H.'s neck, and she was released two days later.

While R.H. was being taken to the hospital, Baker-Henry went to the Philadelphia Special Victims Unit (SVU), where she gave a statement to Officer Justin Montgomery. According to that statement, Nash had come home that morning "fussing," "mad," and with blood on his shirt—saying that R.H.'s mother had "busted him in the mouth" and that "he was going to go find her and kill her."[7] Baker-Henry noticed Nash had a knife near him, which she tried to hide along with her other kitchen knives. Seeing that Nash possessed another knife, she locked herself in her room and called 911. After the call, Baker-Henry overheard Nash telling R.H. to hurry up, and that she was "just like [her] mother."[8] Baker-Henry subsequently observed Nash, who had left the house, standing under a tree with R.H., whose shirt was now bloody. Baker-Henry asked the arriving officers to hurry up.

---

[4] SA 163.
[5] *Id.*
[6] *Id.*
[7] SA 153–54.
[8] SA 154.

When asked if Nash was a drug user, Baker-Henry said that he was, and that she was told the drug Nash used was called "wet".[9]

In 2014, two years after her release from the hospital, R.H. gave a forensic interview to an employee of the Philadelphia Children's Alliance. In that interview, R.H. confirmed that her father had cut her neck with a knife, and made a visible slashing motion across her neck while doing so. She also confirmed many of the details of her grandmother's statement—including that her father had been holding a knife during breakfast because he was mad at her mother, and that after Baker-Henry took the knife away he replaced it with a new one. When asked why she believed her father had cut her, she responded that he was angry and bleeding because of her mom.

**II.**

Following repeated delays, Nash's bench trial in the Philadelphia County Court of Common Pleas began on June 6, 2017.[10]

At trial, the prosecution called multiple police officers to the stand. The prosecution also called R.H. (now age 11) who confirmed that her father had cut her neck and showed her scar to the court, while admitting on cross-examination that Nash had been a generally loving father, that she did not recall him expressing anger at her that morning, and that she was confused why he had attacked her (and thought it must have been an accident).

---

[9] *Id.*

[10] *See* Dist. Ct. Dkt. 14 at 2 (noting that Nash's trial was delayed by repeated continuance requests, counsel changes, and periods of legal incompetency).

4

In her trial testimony, Baker-Henry confirmed that she had been concerned about Nash's behavior and had called 911 on him. Nevertheless, her trial testimony differed markedly from her prior statements. Baker-Henry stated she could not remember seeing Nash with a knife at any point that morning, and deferred to what the tape said. While she conceded that she had taken some knives off the table, she said that this was only to "put them back in the kitchen where they should be."[11] She denied expressing concern about Nash hurting R.H. (and claimed she had been worried only about him taking her to school while mentally impaired). Finally, she denied that Nash had uttered any threatening comments.

As its final witness, the prosecution called Officer Montgomery to the stand. Other than authenticating some prosecution photographs and testifying that he had been unable to take a statement from R.H. around the time of the incident due to her medical condition, Montgomery's direct testimony consisted almost entirely of reading portions of Baker-Henry's statement into the record, confirming they had been accurately transcribed, and verifying that Baker-Henry had been given an opportunity to review the statement. Montgomery was then cross-examined extensively, facing questions about his recordkeeping, his confidence level in his ability to recall Baker-Henry's interview, and the voluntariness with which Baker-Henry had been brought to SVU.

Nash was the sole defense witness. He denied ever intending to harm R.H. (or her mother) and testified to the seriousness with which he took his role as her caretaker in the

---

[11] SA 139.

period prior to his arrest. He explained that, after R.H.'s mother attacked him that morning, he had taken R.H. to Baker-Henry's house while leaving behind two sheetrock knives he used for work. He then took a kitchen knife with him from Baker-Henry's home for a sheetrock repair he had scheduled after dropping R.H. off at school, and, after it fell out of his pocket, decided to carry it. Nash testified that, while walking out to his car with R.H., he noticed that her collar was improperly tucked in, and he accidentally cut her while trying to fix it. Nash had no explanation for the extent of R.H.'s injuries and denied being under the influence of drugs.

Nash was convicted of attempted murder and other crimes, and was sentenced to an aggregate term of ten to twenty years' incarceration followed by ten years' probation.[12]

## III.

Nash filed a pro se habeas petition, pursuant to 28 U.S.C. § 2254, on September 8, 2020. That petition was held in abeyance because Nash had not yet sought state post-conviction relief.[13] Nash subsequently filed a petition under the Pennsylvania Post Conviction Relief Act (PCRA), asserting ineffectiveness and sufficiency claims as well as

---

[12] On appeal, the Pennsylvania Superior Court held that Nash's aggravated assault charge was improperly merged with his attempted murder charge and vacated the portion of Nash's sentence relating to his aggravated assault conviction. However, because Nash was set to serve his sentences for aggravated assault and attempted murder concurrently, the Superior Court concluded that the error did not disturb the trial court's overall sentencing scheme and decided not to remand the case for resentencing. *See Commonwealth v. Nash*, No. 716 EDA 2018, 2020 WL 4436308, at *5–6 (Pa. Super. Ct. Aug. 3, 2020) (*Nash I*). Nash did not seek allocatur.

[13] *See* 28 U.S.C. § 2254(b)(1) (requiring petitioners to first exhaust available state remedies).

a claim that the government had failed, pursuant to *Brady v. Maryland*,[14] to turn over evidence of prior disciplinary infractions by Officer Montgomery.[15] Nash's PCRA petition was denied on September 13, 2021, and that denial was affirmed by the Pennsylvania Superior Court on April 6, 2023.[16]

In June 2022, Nash filed an amended, counseled § 2254 petition, which he later supplemented. Like his PCRA petition, this petition alleged ineffectiveness and sufficiency claims, as well as a *Brady* claim that the prosecution had suppressed evidence of prior misconduct by Officer Montgomery. The evidence in question consisted of (1) a sustained disciplinary complaint alleging that, on October 25, 2014, a group of officers (including Montgomery) failed to properly investigate the complaint's allegation that a victim had been indecently assaulted in a taxi cab, and (2) a widely publicized story that Montgomery had minimized and failed to properly investigate a victim's claims that she had been sexually assaulted at the 2016 Democratic National Convention.[17]

A magistrate judge issued a report and recommendation, concluding that Nash's petition should be denied in full.[18] Later, with one procedural exception, the District Court

---

[14] 373 U.S. 83 (1963).

[15] *See Commonwealth v. Nash*, No. 2145 EDA 2021, 2023 WL 2808473, at *1 (Pa. Super. Ct. Apr. 6, 2023) (*Nash II*).

[16] *See id*.

[17] It is unclear from the record whether Nash raised both incidents before the PCRA Court, or only the incident concerning Snyder.

[18] *See Nash v. Close*, CV 20-4431, 2023 WL 6771954 (E.D. Pa. Aug. 25, 2023).

adopted that report and recommendation in full.[19]  Nevertheless, finding that "reasonable

jurists could debate whether" the prosecution had violated *Brady*, the District Court granted

Nash a certificate of appealability on his *Brady* claim.[20]  Nash appealed.

**IV.**

The District Court had jurisdiction under 28 U.S.C. § 2241 and 28 U.S.C. § 2254.

We have appellate jurisdiction under 28 U.S.C. § 1291 and 28 U.S.C. § 2253.  Where a

state court has ruled on the merits of a legal question, federal habeas courts are bound by

that ruling unless it is either "contrary to" or "an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States."[21]  Here,

the state court rejected Nash's *Brady* claim solely because the disciplinary records at issue

could have been located by Nash with proper diligence.[22]  But it is clearly established that

"the concept of 'due diligence' plays no role in the *Brady* analysis."[23]  The District Court

therefore reviewed Nash's *Brady* claim de novo, without regard to the state court's

decision.[24]  Because the District Court did not conduct an evidentiary hearing, our review

of its holding is likewise de novo.[25]

---

[19] *Nash v. Smith*, No. CV 20-4431, 2023 WL 6690704, at *1 (E.D. Pa. Oct. 12, 2023) (*Nash III*).  While finding it unnecessary to address the issue of exhaustion, the District Court rejected the Magistrate Judge's conclusion that the Commonwealth had forfeited its exhaustion arguments.  *Id*. at *1 n.1; *see* 28 U.S.C. § 2254(b)(3).

[20] *Nash III*, 2023 WL 6690704, at *1 (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)); *see* 28 U.S.C. § 2253(c)(2).  We denied Nash's motion to expand his certificate of appealability to include his remaining habeas claims.

[21] 28 U.S.C. § 2254(d)(1).

[22] *Nash II*, 2023 WL 2808473, at *6.

[23] *See Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 291 (3d Cir. 2016) (en banc).

[24] *See id.* at 284; *Nash III*, 2023 WL 6690704, at *1.

[25] *See Roman v. DiGuglielmo*, 675 F.3d 204, 208 (3d Cir. 2012).

## V.

Under *Brady* and its progeny, prosecutors must disclose evidence which might help impeach one of their witnesses.[26] "[N]ot every failure to disclose," however, amounts to a *Brady* violation.[27] Instead, a petitioner must show that "(1) the withheld evidence was favorable to him . . . (2) the State suppressed the evidence . . . and (3) the evidence was material such that prejudice resulted from its suppression."[28]

Here, the Commonwealth concedes that evidence of Montgomery's prior disciplinary incidents was both withheld and favorable. As such, the only issue is whether it was material—put otherwise, whether there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[29] Nash argues that it was. In particular, he claims that had his trial attorney been given the suppressed records she would have argued that Montgomery "had a motive to embellish, or mischaracterize what the witnesses in this case told him during their respective interviews in order to ensure that he was not accused of taking [*sic*] an alleged victim's story seriously."[30]

However, to the extent that Montgomery's testimony played a role in securing Nash's conviction, it was through rebutting Baker-Henry's claim that her SVU statement had been inaccurately transcribed. It is far from clear to us that Baker-Henry's SVU

---

[26] *See United States v. Bagley*, 473 U.S. 667, 676 (1985) (noting that "impeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule").

[27] *See Rega v. Sec'y, Pa. Dep't of Corr.*, 115 F.4th 235, 241 (3d Cir. 2024).

[28] *Id.* (internal quotations omitted).

[29] *See Kyles v. Whitley*, 514 U.S. 419, 435 (1995) (internal quotation omitted).

[30] App. Br. 20.

statement was needed for Nash's conviction, given the uncontroverted evidence of Nash's cutting R.H.'s neck with a kitchen knife, R.H.'s medical records showing the depth of her injuries, R.H.'s statements to the Children's Alliance concerning her father's mental state, and the sheer implausibility of Nash's version of the incident.

Moreover, even assuming that Baker-Henry's statement was necessary, a juror could reasonably conclude that her efforts to retract it at trial were not credible. Baker-Henry had a motive to reduce her son's legal exposure. We are not persuaded that any reasonable juror would have voted differently if presented with the suppressed evidence about Officer Montgomery.[31]

Finally, whatever the plausibility of Baker-Henry's retractions, Nash's argument that Montgomery was motivated to bolster her original statements is weak. Montgomery took and transcribed Baker-Henry's statement in 2013, over a year before the first disciplinary complaint against her, and three years before the second allegation of misconduct. Even if the ensuing disciplinary proceedings provided Montgomery with a motive to embellish, Baker-Henry's statement had already been taken and documented. The bulk of Montgomery's testimony consisted of reading the statement into the record verbatim. To the extent that Montgomery's remaining testimony provided marginal additional support to the prosecution, we see no reasonable probability that it bore a role in the trial's outcome.

---

[31] *See Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013) (noting that, where suppressed evidence "would be used to impeach testimony of a witness whose account is strongly corroborated," it "is generally not considered material for *Brady* purposes").

In short, the impeachment value of the suppressed evidence is insufficient to shake our confidence in Nash's verdict.  It follows that he has failed to make out a cognizable claim under *Brady*, and as such, a cognizable claim for relief.

## VI.

For the aforementioned reasons, we will affirm the District Court's order denying Nash's petition for a writ of habeas corpus.