# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before the Court Sitting En Banc[1]

**Private RONALD GRAY,**
**United States Army, Petitioner**
**v.**
**UNITED STATES, Respondent**[2]

ARMY MISC 20160775

For Petitioner: Mr. Shawn Nolan, Esquire; Mr. Timothy Kane, Esquire; Mr. Jonathan Jeffress, Esquire (on brief and reply brief).

For Respondent: Colonel Mark H. Sydenham, JA; Lieutenant Colonel A.G. Courie III, JA; Lieutenant Colonel Karen J. Borgerding, JA; Major Michael E. Korte, JA; Captain Samuel E. Landes (on brief).

9 May 2017

--------------------------------------------------------------------------------
OPINION OF THE COURT AND ACTION ON PETITION FOR
EXTRAORDINARY RELIEF IN THE NATURE OF A WRIT OF *CORAM NOBIS*
--------------------------------------------------------------------------------

PENLAND, Judge:

Ronald Gray (Petitioner) is confined and awaiting imposition of a death sentence adjudged by a general court-martial on 12 April 1988, approved by the convening authority on 29 July 1988, affirmed by this court and our superior

---

[1] Senior Judge MULLIGAN is taking no part in this case as a result of his disqualification.

[2] Petitioner named the Commandant of Fort Leavenworth's Disciplinary Barracks as respondent, but the parties to this case are the United States and Ronald Gray. His petition for *coram nobis* relief is "a step in the criminal case and not, like habeas corpus where relief is sought in a separate case and record, the beginning of a separate [] proceeding." *United States v. Denedo*, 556 U.S. 904, 912 (2009) (*Denedo II*) (quoting *United States v. Morgan*, 346 U.S. 502, 505, n.4 (1954)).

appellate court on 15 December 1992,[3] 9 June 1993,[4] and 28 May 1999,[5] respectively, and approved by the President on 28 July 2008. In *Gray v. Belcher*, 70 M.J. 646 (Army Ct. Crim. App. 2012), we denied *coram nobis* relief, in light of petitioner's concurrent pursuit of habeas relief in an Article III court. However, that Article III court ultimately dismissed the habeas petition, reasoning petitioner had not exhausted his military-specific claims within the military justice system. *Gray v. Belcher*, No. 5:08-cv-03289-JTM (D. Kan. 26 Oct. 2016) (memorandum and order dismissing without prejudice). Petitioner returns to us again,[6] enumerating seven claims that, in his view, justify *coram nobis* relief in the form of vacating the findings and sentence.[7]

Petitioner alternatively seeks a writ of habeas corpus. We will not evaluate the petition in this alternative manner. In *United States v. Loving*, 68 M.J. 1, 4 (C.A.A.F. 2009) (*Loving III*), our superior court considered a petition for such a writ, noting:

> While the case remained pending *within the military justice system*, [petitioner] had a number of options, including filing a habeas petition in our court or awaiting action by the president before seeking judicial review. He elected to file a petition for writ of habeas corpus in our court.

(citing *Loving v. United States*, 64 M.J. 132, 134 (C.A.A.F. 2006) (*Loving II*) (emphasis added).

For the reasons below, we consider the instant petition as one seeking *coram nobis* relief. However, this case has departed the military justice system as

---

[3] *United States v. Gray*, 37 M.J. 730 (A.C.M.R. 1992) (*Gray ACCA I*).

[4] *United States v. Gray*, 37 M.J. 751, 761 (Army Ct. Crim. App. 1993), (*Gray ACCA II*)

[5] *United States v. Gray*, 51 M.J. 1 (C.A.A.F. 1999) (*Gray CAAF*) (cert. denied).

[6] In 2016, petitioner sought *coram nobis* relief from us for the second time, but we dismissed his petition without prejudice, pending federal district court action on his habeas petition. *United States v. Gray*, ARMY MISC 20160086 (Army Ct. Crim. App. 10 May 2016)(order).

[7] Petitioner also requests "appropriate discovery and [] a *Dubay* hearing at which proof may be offered concerning the allegations contained in [his] Petition." (Pet'r Br. 120).

described in *Loving v United States*, 62 M.J. 235, 240 (C.A.A.F. 2005) (*Loving I*) and *Loving II*. Therefore, following the majority's logic[8] in those cases, we lack jurisdiction to grant a writ of habeas corpus.

## BACKGROUND

Previous opinions of this court and our superior court have ably summarized the facts that led to petitioner's general court-martial; we need not restate them. However, given the issues raised in this petition, it is appropriate to summarize certain events from the case's pretrial, trial, and direct appellate history.

A large part of this petition involves petitioner's competency during trial and during direct appellate review. Based on their interactions with petitioner, trial defense counsel sought a professional assessment of his capacity to stand trial. *See* Rule for Courts-Martial [hereinafter R.C.M.] 909.[9] Dr. Selwyn Rose addressed the

---

[8] Judge Ryan's dissent in *Loving II* is also informative, for it addresses the different jurisdictional considerations regarding *coram nobis* and habeas corpus relief. *Loving II*, 68 M.J. at 25 ("unlike a writ of *coram nobis*, habeas corpus is not a 'belated extension' of the original court-martial proceeding.") (quoting *Denedo II*, 556 U.S. at 912-13).

[9] In the *Manual for Courts-Martial, United States* (1984 ed.) [hereinafter *MCM, 1984*], R.C.M. 909 was shorter than the current version; it stated:

> (a) *In general*. No person may be brought to trial by court-martial unless that person possesses sufficient mental capacity to understand the nature of the proceedings against that person and to conduct or cooperate intelligently in the defense of the case.
>
> (b) *Presumption of capacity*. A person is presumed to have the capacity to stand trial unless the contrary appears.
>
> (c) *Determination at trial*.
>
> > (1) *Nature of the issue*. The mental capacity of the accused is an interlocutory question of fact.
> >
> > (2) *Standard*. When the issue of the accused's capacity to stand trial is raised, trial may not

(continued . . .)

matter of "competence" in a 4 November 1987 letter to Captain (CPT) MPB, trial defense counsel, reporting his assessment after examining petitioner three days earlier:

> Throughout the interview, [petitioner] was posturing, staring, darting his eyes from place to place, and he maintained a suspicious, paranoid look. He responded slowly, often repeating questions and seemed to be lost in his own thoughts which were not in contact with what was being discussed.
>
> Religious ideation pervaded all of his comments. He announced that he could walk out of the jail if God wanted him to. He refused to discuss the criminal charges with me. He talked about his "visions" as a child and recent ones, which were religious in nature and dealt with powerful lights and movement through space. He interpreted these visions to mean that "the Lord is coming."
>
> He referred to the night he came here (to jail) and was "hearing" things, "like a hand touching and going through my skin." He believes that God pulled his soul out. He claims to have made a joke that the space shuttle would blow up either saw himself as prescient or believed that his statement had caused the disaster. He talked a great deal about the meaning of the number seven since there were seven people in the space shuttle.
>
> When I led the discussion back to the killings with which he is charged, he talked about a "gathering" and not a

---

(. . . continued)

> proceed unless it is established by a preponderance of the evidence that the accused possesses sufficient mental capacity to understand the nature of the proceedings against the accused and to conduct or cooperate intelligently in the defense of the case.

R.C.M. 909, *MCM*, 1984. The current rule is worded slightly differently and also addresses determinations of mental competence before and after referral, incompetence determination hearings in more depth, and hospitalization of the accused. R.C.M. 909, *MCM*, 2016.

> "hating." His comments had autistic meanings that were unclear to me.
>
> It is my opinion that Mr. Gray is not presently mentally competent to stand trial. I can't determine whether he knows the nature of the charges against him, but I am convinced he is unable to cooperate with counsel in a rational manner. My present diagnosis is Schizophrenia, Paranoid type. I think it would be important that the [petitioner] be treated with major tranquilizers, but he will not cooperate in the jail and take the medication.
>
> I am unable to proceed with my evaluation because of the severity of his present mental illness and my inability to force treatment. Mr. Gray needs to be in a psychiatric setting where he can be observed over a period of time and given appropriate chemotherapy to see if his competence can be restored.

On 10 November 1987, CPT MPB requested the convening authority direct a sanity board under R.C.M. 706. Petitioner's mental capacity was one of the numerous matters trial defense counsel requested the board evaluate: "Does SP4 Gray have sufficient mental capacity to understand the nature of the proceedings and to conduct and/or cooperate intelligently in his defense?"

On 23 November 1987, the convening authority granted the defense request and according to the trial defense team during a 21 December 1987 Article 39a, Uniform Code of Military Justice, 10 U.S.C. § 839a [hereinafter UCMJ], session, "appointed a board with Colonel Armitage, who is a forensic psychiatrist, as head of that board." At a later pretrial session on 8 February 1988, government counsel informed the military judge that the board had found petitioner "competent to stand trial," and trial defense counsel acknowledged "that's the preliminary indication that we got." The military judge then addressed a defense motion to employ Dr. Rose as a forensic psychiatrist. The motion averred, inter alia:

> As set forth in the defense motion for an inquiry[10] into the mental capacity and mental responsibility of the accused under the provisions of R.C.M. 706, there is substantial reason to believe that the accused lacked mental *responsibility* at the time of the alleged offenses (R.C.M.

---

[10] There is no separate "motion" in the record of trial; defense counsel may have been referring to their 10 November 1987 request to the convening authority.

> 916(k)) and lacks *capacity* to stand trial at this time
> (R.C.M. 909).

(App. Ex. XXI at 1) (emphasis added).

Defense counsel told the military judge "Dr. Rose would certainly come in and testify that [] in his opinion, this accused is not capable of standing trial . . . . But our problem is we have no money to get him into this courtroom since we have an indigent accused." Defense counsel continued, "[O]ur preparation is really stymied with respect to mental responsibility, capacity, and partial mental responsibility until we can get a psychiatrist to help us prepare that defense." Defense counsel also provided the military judge with Dr. Rose's 4 November 1987 assessment, which opined petitioner was not "presently competent to stand trial." (App. Ex. XXIII at 1).

On 14 March 1988, after the panel had been sworn, the military judge sought to resolve any outstanding preliminary matters in an Article 39a session. Counsel for both sides confirmed "the defense request for a forensic psychiatrist has been granted." The military judge also reviewed the results of petitioner's sanity board, which stated the following:

> SP4 Gray presently suffers from a mental disease or defict
> [sic] but it does not render him mentally incompetent to
> the extent that he is unable to understand the nature of the
> proceedings or to conduct or cooperate intelligently in his
> defense.

(App. Ex. XXXIII at 2).

On 6 April 1988, the military judge advised petitioner of his rights to submit matters if the trial moved to a sentencing phase, including his rights to offer evidence in extenuation and mitigation, and to testify or make an unsworn statement. Petitioner responded, "I understand." The panel announced findings on 7 April 1988.

Trial defense counsel called numerous sentencing witnesses, including DF, the chief jailor for Cumberland County Jail, where petitioner was confined before his court-martial. DF described petitioner as "very hostile" and "very distant" when he initially arrived on 7 January 1987. After a three-month stay in isolated confinement, imposed as a result of his near-rage, petitioner was housed with others charged with first-degree murder. DF testified about petitioner's behavior for the "nine to ten months" thereafter:

6

DC:  During that time did you have conversations with him also?

A.  Several times.

DC:  Any recurrence of rage?  Any attitude problems or anything?

A:  No.  Like I said, after -- after the initial episode and his stay in isolation, it seemed like he just resolved himself to where he was at and was going to go along with the program, not fight the problem.

[. . .]

DC:  What's Ronald's reputation been among the other jailors, the other inmates, as far as being cooperative, being pleasant, things like that?

A:  Now, that -- that I can't address.  I didn't ask anybody's opinion.

DC:  Okay.  You receive incident reports if anything negative happens, is that correct?

A:  Correct.

DC: All right.  Had you received ----

A:  Anything out of the ordinary would require an incident report.

DC:  What kind of incident reports did you receive on Specialist Gray then?

A:  There haven't been any incident reports on him.

DC:  Has Specialist Gray been cooperative since he's been in E-block?

A:  Yes.

DC:  Been able to talk to him?  Any problem?

A:  I've been able to communicate fine with him.

Trial defense counsel also called Dr. Rose as a sentencing witness, and he described his evaluation of petitioner:

> His thinking is very strange at times, it seems -- psychotic, to be delusional, caught up in these false beliefs that have no basis in fact. At other times it seems quite realistic and he switches back and forth, and I can't predict when he's going to switch. I think it's important that, as Doctor Armitage says, when he told him, "I want to talk about a certain thing," and he nailed him down -- that Ron can do that. That is under a given set of restrictions. He can hold his thinking together. But when you let him go on his own, he tends to drift in a lot of -- a lot of different unique directions, separate directions.
>
> DC: What's your opinion of Specialist Gray's ability to follow directions, to respect authority, things like that?
>
> A: Generally, quite good. Certainly, in his service career, [] during his childhood [he] followed directions, did what was expected of him. So generally, it's quite good. And even when Colonel Armitage meets with him and says, "This is what I'd like to talk about," he focuses real well. So he's capable of following commands.

Later, the military judge specifically asked Dr. Rose about petitioner's competence:

> MJ: [A]s [petitioner] sits before you today, by the defense, sitting by the defense counsels, in your considered opinion, does he have the mental capacity to understand the nature of these proceedings and conduct or cooperate intelligently in that defense?
>
> A: Yes, he does.

After the panel announced its sentence, the military judge advised petitioner of his post-trial and appellate rights. Asked if he had any questions regarding them, petitioner said, "No, sir."

On 22 December 1989, with his case on direct appeal, petitioner's three appellate defense counsel, CPT MJB, CPT CGW, and CPT JJF, moved this court to:

> direct the convening of a sanity board to inquire into
> appellant's mental responsibility at the time of his
> offenses and his mental capacity to assist in his defense at
> his court-martial; further to inquire into the present
> capacity of appellant to understand the nature of or to
> cooperate intelligently in these proceedings.

Appellate defense counsel criticized Dr. Armitage's and Dr. Rose's previous evaluations, describing them as "cursory," "inaccura[te] and inadequa[te]." Included with the motion was a psychological evaluation prepared by CPT William Kea, Ph.D., a clinical psychologist (Dr. Kea). Dr. Kea wrote that petitioner "was referred for a psychological evaluation at the request of Mr. [JL], and inmate's Appellate Defense Attorney, CPT [JS]."[11] After "a clinical interview conducted over a period of five days,"[12] Dr. Kea issued a fourteen-page report, which concluded:

> [. . . A]t the time of the alleged criminal conduct, the
> accused did have a severe mental disease or defect.
>
> [. . .]
>
> [. . . T]he accused, at the time of the alleged criminal
> conduct and as a result of such severe mental disease or
> defect, was unable to appreciate the nature and quality or
> wrongfulness of his conduct.
>
> [. . . T]he accused, at the time of trial in 1988, did not
> have sufficient mental capacity . . . to cooperate
> intelligently in the defense.
>
> [. . . T]he accused does not now have sufficient mental
> capacity . . . to cooperate intelligently in the defense.

(Internal line markings omitted; ellipses in original).

Presented with this development, on 13 February 1990, this court directed a sanity board to inquire "into the appellant's mental responsibility at the time of the offenses, [his] mental capacity at the time of his court-martial, and [his] present

---

[11] Captain JS was petitioner's initial appellate defense counsel. The evaluation refers to CPT JS's 8 August 1989 written request.

[12] 23, 25, 28 and 29 August 1989, and 1 September 1989.

mental capacity. . . ." *United States v. Gray*, ARMY 8800807 (A.C.M.R. 13 Feb. 1990) (order). We specifically directed findings regarding:

> whether [petitioner] had sufficient mental capacity to understand the nature of the court-martial proceedings and to conduct or cooperate intelligently in his defense at the time of trial;
>
> [petitioner's] present clinical diagnosis; and,
>
> whether [petitioner] presently possesses sufficient mental capacity to understand the nature of the pending appellate proceedings and to conduct or cooperate intelligently in his appeal.

*Id.* (internal line markings omitted).

On 3 August 1990, this court received the results of this evaluation, which was conducted "between 03 April and 29 June 1990." The board consisted of Dr. Kea, CPT Sandra Edwards, M.D. (Dr. Edwards), and CPT Michael Marceau, M.D. (Dr. Marceau). The board included, *inter alia*, "a review of available psychological reports."

> The board found:
>
> [. . . T]he appellant has sufficient mental capacity to understand the nature of the court-martial proceedings and to conduct or cooperate intelligently in his defense at the time of trial.
>
> For appellant's present clinical psychiatric diagnosis refer to Section 11-3.
>
> [. . .T]he appellant presently possesses sufficient mental capacity to understand the nature of the pending appellate proceedings and to conduct or cooperate intelligently in his appeal.

Memorandum, Subject: Findings of a psychiatric evaluation of Ronald A. Gray, SSN [] Reg. #73786; ACMR 8800807 (30 Jun. 1990) (internal line markings omitted).

The "available psychological reports," to which the board referred and appended to its report, consisted of two evaluations. The first, bearing the signature

blocks of Dr. Kea and Dr. Marceau but only Dr. Kea's signature, was virtually identical to the one previously requested by CPT JS, but unlike the report that appellate defense counsel submitted with their motion, it did not include findings regarding petitioner's mental responsibility or competence.[13]  The second report, again prepared by Dr. Kea who described it as a supplemental report based on "comprehensive neuropsychological testing conducted between 19 and 22 June 1990," concluded:

> The results of the examination suggest that the patient suffers from some diffuse and undifferentiated brain damage that could possibly be of a long standing nature. Although the find[ing]s are positive, they do not appear to account for the magnitude that would compromise any legal/criminal responsibility.

Memorandum, Subject: Medical Consultation Report Neuropsychological Evaluation (undated).

Despite this result, petitioner's appellate defense counsel continued to press for resources in order to evaluate his mental condition.[14]  On 31 December 1991, appellate defense counsel filed with this court a motion to compel additional medical and neurological testing of petitioner.  Appellate defense counsel wrote, "the mental evaluations that have been performed on appellant to date have been fundamentally defective in several ways."

This court granted the motion and directed four additional tests:  1) a Magnetic Resonance Imaging (MRI) scan of petitioner's brain; 2) a twenty-channel, scalp electrode, sleep-deprived electroencephalogram (EEG); 3) a positron emission tomography (PET) scan, or if impossible to perform, a single-photon emission computed tomography (SPECT) scan of petitioner's brain; and, 4) a complete battery

---

[13] The appellate record before this court also contains yet another version of the report requested by CPT JS, this time signed by both Dr. Kea and Dr. Marceau.  This version stated "further evaluation is necessary" to determine whether petitioner lacked mental responsibility for his crimes and continued, "[i]t is unclear whether the accused, at the time of trial in 1988, did not have sufficient mental capacity . . . to cooperate intelligently in the defense."  (Ellipses in original).  This version of the report concluded, "[t]he results of the neurological examination will be useful to determine whether the accused now has sufficient mental capacity . . . to cooperate intelligently in the defense."  (Ellipses in original).

[14] For an able summary of some of appellate defense counsel's efforts, *see United States v. Gray*, ARMY 8800807 (A.C.M.R. 12 Nov. 1991) (order).

of intellectual, neuropsychological, academic, psychological, and personality tests performed by a fully qualified and credentialed neuropsychologist to determine the presence and/or extent of intellectual or neuropsychological deficits and any psychological or personality disorder.[15]

In a 23 March 1992 affidavit, Major (MAJ) Fred Brown, Ph.D. (Dr. Brown), a clinical neuropsychologist, described his evaluation of petitioner.

> In January, 1992 the Chief of Psychology [] at the United States Disciplinary Barracks, Fort Leavenworth, Kansas, contacted me regarding a court ordered neuropsychological evaluation on [petitioner]. I agreed to perform the evaluation which took place during the week of 27 January, 1992 through 1 February, 1992. I was introduced to [petitioner] on 27 January, 1992 [] but did not initiate the evaluation until following a joint meeting with [petitioner], his [appellate defense counsel], and myself. Including the time spent interviewing, testing, and interpreting I spent a total of about 30 hours with [petitioner].

(Gov't App. Ex. 1 at 2).

Dr. Brown indicated petitioner possessed an "organic brain syndrome" that resulted in "only mild inefficiency of brain functioning." (Gov't App. Ex. 1 at 4). He wrote that, at the time of his evaluation, petitioner was "able to fully appreciate the nature and quality or the wrongfulness of his acts." (Gov't App. Ex. 1 at 4). He further wrote, "If, at the time of his offenses, Mr. Gray's brain functioning was the same as it is currently, I believe that he would have possessed mental responsibility as defined above." (Gov't App. Ex. 1 at 4).

This court affirmed the findings and sentence on 15 December 1992, *Gray ACCA I*, 37 M.J. at 749, again affirmed them on 9 June 1993, *Gray ACCA II*, 37 M.J. at 761),[16] and denied petitioner's motion for reconsideration. The case was docketed

---

[15] For more detailed description of ordered testing, *see United States v. Gray*, ARMY 8800807 (A.C.M.R. 31 Dec. 1991) (order).

[16] Appellate defense counsel filed a motion to abate the proceedings on direct appeal following petitioner's drug overdose, asserting petitioner was unable to assist in his appeal as a result. This court denied the motion on 30 December 1992. *Gray ACCA II*, 37 M.J. at 753.

with the Court of Appeals for the Armed Forces[17] (CAAF) on 2 July 1993.  *United States v. Gray*, 38 M.J. 305 (C.M.A. 2 Jul. 1993).  The CAAF affirmed this court's decision on 28 May 1999 (*Gray CAAF*), and denied two petitions for reconsideration, the later of the two on 26 June 2000.[18]  The United States Supreme Court denied a petition for a writ of certiorari and petition for rehearing on 19 March 2001 and 14 May 2001, respectively. [19]

On 4 August 2008, approximately one week after the President approved the death sentence in this case, the Chief, Defense Appellate Division, United States Army Legal Services Agency, requested via memorandum that The Judge Advocate General appoint him and additional counsel as necessary to assist petitioner "with his pending habeas corpus action."  The memorandum explained:

> [Petitioner] is currently represented by civilian counsel; however, the Defense Appellate Division has represented [petitioner], along with civilian counsel, since his original court-martial.

On 14 August 2008, The Judge Advocate General signed a memorandum appointing the Chief, Defense Appellate Division, and "such additional or other military counsel as you deem necessary, to represent [petitioner] in filing post-conviction habeas corpus petitions in Federal civilian courts."

## LAW AND ANALYSIS

*Part I - Jurisdiction to Issue and Requirements for a Writ of Coram Nobis*

Article 66, UCMJ, confers our jurisdiction to consider all but one of petitioner's claims[20] and issue a writ of *coram nobis* if necessary and appropriate in

---

[17] Formerly the United States Court of Military Appeals (name change effective 5 October 1994; *see* Act of Oct. 5, 1994, Pub. L. No. 103-337, § 924(a)(c)(1), (2), (4)(B), 108 Stat. 2831, 32 (1994) (Amending provisions of the UCMJ to rename the United States Court of Military Appeals as the United States Court of Appeals for the Armed Forces).

[18] *United States v. Gray*, ARMY 8800807, 2000 CAAF LEXIS 358 (6 Apr. 2000); *United States v. Gray*, ARMY 8800807, 2000 CAAF LEXIS 677 (26 Jun. 2000).

[19] *Gray v. United States*, 532 U.S. 919 (2001); *Gray v. United States*, 532 U.S. 1035 (2001).

[20] *See* Part III (Claim 3), *infra*.

aid thereof. *See United States v. Denedo*, 66 M.J. 114, 123 (C.A.A.F. 2008) (*Denedo I*); *Denedo II*, 556 U.S. at 917; 28 U.S.C. § 1651(a) (All Writs Act). The All Writs Act does not expand our underlying jurisdiction to consider "the findings and sentence as approved by the convening authority." UCMJ, art. 66(c); *Denedo I*, 66 M.J. at 120; *Denedo II*, 556 U.S. at 914.

The United States Supreme Court established the landscape of our inquiry in *Denedo II*. "Because *coram nobis* is but an extraordinary tool to correct a legal or factual error, an application for the writ is properly viewed as a belated extension of the original proceeding during which the error allegedly transpired." *Denedo II*, 556 U.S. at 912-13.

In *Denedo I*, which involved a post-conviction attack after the petitioner had served his sentence, our superior court established six prerequisites for a meritorious *coram nobis* claim:

> (1) the alleged error[21] is of the most fundamental character;
>
> (2) no remedy other than coram nobis is available to rectify the consequences of the error;
>
> (3) valid reasons exist for not seeking relief earlier;
>
> (4) the new information presented in the petition could not have been discovered through the exercise of reasonable diligence prior to the original judgment;
>
> (5) the writ does not seek to reevaluate previously considered evidence or legal issues; and
>
> (6) the sentence has been served, but the consequences of the erroneous conviction persist.

*Denedo I*, 66 M.J. at 126 (citing *Morgan*, 346 U.S. at 512-13; *United States v. Loving I*, 62 M.J. at 252-53) (remaining citations omitted).

---

[21] Because the standard for granting extraordinary relief requires a petitioner to establish that issuance of the requested writ is "necessary and appropriate," we interpret this first prerequisite to mean a petitioner must do more than merely *allege* error. *See* 28 U.S.C. § 1651(a); *Denedo I*, 66 M.J. at 126. He has the burden to establish the error occurred.

*Part II - Petitioner's Claims Generally*

Before analyzing the claims more specifically, we consider whether the second, third and sixth *Denedo I* factors control the claims identically.

The second *Denedo I* factor requires us to assess whether an alternate remedy is available. As stated above, we lack jurisdiction to grant habeas relief in this post-finality case; therefore no remedy other than *coram nobis* is available to petitioner in *this court*. We decline to conclude whether, as a matter of law, an alternative remedy is available to petitioner in a civilian federal court, for to make such a conclusion—one way or the other—would require us to consider, *inter alia*, another court's jurisdictional reach. We shall not stray into such an assessment. We do note, however, that Department of Justice counsel argued with persuasive effect in the United States District Court for the District of Kansas that petitioner should have litigated the instant claims in the military justice system before raising them in a habeas corpus action in an Article III court. In an interesting turn of advocacy within the executive branch, the Army's government appellate counsel now insist we should "dismiss the petition with prejudice" because "whether or not any Article III litigation is currently pending, it is available to [petitioner]." The United States cannot have it both ways, at least not in the context of this petition, and create a "Catch-22" that avoids matters properly before us.

We resolve the third *Denedo I* factor against petitioner, for we perceive no valid reason for his failure to seek relief earlier. Each of petitioner's claims over which we have jurisdiction was ripe for his complaint as soon as the Supreme Court denied his petition for certiorari sixteen years ago.[22] Petitioner's counsel urge that conflict-of-interest considerations render it unreasonable to expect previous appellate defense counsel to raise ineffective appellate assistance issues against themselves. This argument is meritless, for petitioner makes no showing and—based on the record before us can make none—that his appellate defense counsel before this court on direct appeal continued to represent him afterward. In other words, after this court rendered its decisions on direct appeal, petitioner's new appellate and post-conviction relief counsel were not burdened by any conflict-of-interest considerations that would have hampered criticism of their predecessors.

Citing *Loving I*, 62 M.J. at 240, petitioner's counsel also address the Supreme Court's certiorari denial: "At the time, the law recognized no mechanism for post-conviction review pending presidential approval of a military death sentence." (Pet'r Reply Br. 29). This passage causes us to recall our superior court's

---

[22] It would have been inappropriate for this court to consider, much less grant, *coram nobis* relief while our superior court was in the midst of its own mandatory review, or while his certiorari petition was under advisement at the Supreme Court.

observation regarding jurisdiction to consider a petition for a writ of *coram nobis* after completion of Article 67(a), UCMJ, review but before finality under Article 76, UCMJ.

> This issue invites the Court to consider two questions of *first impression*:  (1) when a capital case becomes final in the military justice system and (2) what impact finality has on this Court's jurisdiction.

*Loving I*, 62 M.J. at 240 (emphasis added).

Because such petition for review opened *new* questions about military appellate jurisdiction, it follows that no jurisdictional obstacle prevented petitioner from bringing the instant claims before *Loving I* was decided in 2005.  It also follows that the jurisdictional question was *settled* for over five years—only to be cemented by *Denedo I* and *Denedo II* during that period—before petitioner filed his first *coram nobis* petition with this court on 11 February 2011.[23]

We also resolve the sixth *Denedo I* factor against petitioner with respect to all of his claims over which we have jurisdiction, for his sentence has not been served. From our plain reading of *Denedo I*—including its reliance on *Loving*, a capital case—we conclude the sixth factor applies in all cases, including those involving a sentence to death.  Petitioner correctly notes that, in *Denedo II*, the United States Supreme Court did not specifically adopt the six-factor test established by the CAAF.  However, the Supreme Court also did not disturb the six-factor test in affirming our superior court; both decisions jointly and *severally* bind us.

Beyond the claim-transcendent and dispositive third and sixth factors, it is also appropriate to more specifically address petitioner's claims.  With respect to each of his claims that we possess jurisdiction to consider—and for reasons specific to each—we find petitioner has failed to establish the existence of error.

### Part III - Petitioner's Claims Specifically

1.[24]  PETITIONER WAS DENIED HIS RIGHTS UNDER THE SIXTH AND EIGHTH AMENDMENTS WHEN HE WAS TRIED WHILE INCOMPETENT TO PROCEED AND WHEN HE WAS INCOMPETENT DURING PORTIONS OF THE APPELLATE PROCEEDINGS; THE TRIAL COURT AND THE APPELLATE COURTS ERRED IN NOT CONDUCTING COMPETENCY PROCEEDINGS; AND

---

[23] *Gray v. Belcher*, 70 M.J. at 647.

[24] Numbers adopted from instant petition.

PRIOR COUNSEL WERE INEFFECTIVE FOR FAILING TO LITIGATE PETITIONER'S INCOMPETENCE.[25]

The United States Supreme Court established the temporal landscape of our current inquiry in *Denedo II* as "a belated extension of the original proceeding during which the error allegedly transpired." *Denedo II*, 556 U.S. at 913. With this view in mind, we shall only address relevant aspects of the previous proceedings *at this court and below*. We shall not assess appellate defense counsel's effectiveness at our superior court and beyond, for doing so would exceed our limited statutory jurisdiction.

The Sixth Amendment guarantees the effective assistance of counsel at trial. *Strickland v. Washington*, 466 U.S. 668, 685 (1984) ("The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled."); R.C.M. 506 (Accused's Rights to Counsel). Our superior court has also held that the UCMJ provides a military accused with the right to effective assistance of counsel on appeal. *United States v. Palenius*, 2 M.J. 86, 90 (C.M.A. 1977); *see also Evitts v. Lucey*, 469 U.S. 387, 392 (1985) (the Due Process Clause of the Fourteenth Amendment entitles a criminal appellant to effective assistance of counsel during an appeal of right).

Applying this legal framework against the facts above and matters currently averred by petitioner, we find petitioner's counsel at trial and on direct appeal before this court competently, diligently, and zealously sought to determine whether he possessed the necessary capacity to participate in the defense and appeal of his case. Trial defense counsel obtained a determination of the question from a sanity board. Beyond this, the military judge asked a defense expert whether petitioner was competent and was told yes. Then, on multiple occasions, appellate defense counsel sought, and ultimately received, the same conclusion from a sanity board composed of different members. Finally, appellate defense counsel prevailed in obtaining a separate neuropsychological examination, which yielded no conclusions to undermine the previous competence determinations.

Petitioner's counsel aver, *inter alia*, "[t]rial and appellate counsel were ineffective for failing to challenge the erroneous conclusions of the boards that Petitioner was competent." (Pet'r Reply Br. 29). Beyond our conclusion that

---

[25] Based on our review of petitioner's instant submissions, the trial record, and the appellate record before this court, his multiple claims of ineffective assistance of counsel are demonstrably improbable, which enables us to resolve them without an evidentiary hearing. *United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997).

defense counsel at trial and on direct appeal before this court did not "fail" and that they instead were competent, diligent, and zealous, we additionally note that this quoted passage asserts facts that are only partly accurate. As described previously in the background section, the record makes it abundantly clear that appellate defense counsel conveyed, through tenacious advocacy, their dissatisfaction with the trial-and-appellate-level evaluations.

We find no deficiency in trial and appellate counsel's not seeking the "adversarial" competency hearing petitioner's counsel now urge was indicated, for a viable basis to do so simply did not exist.

2. PETITIONER WAS DENIED DUE PROCESS WHEN MILITARY AUTHORITIES FAILED TO DISCLOSE EVIDENCE REGARDING PETITIONER'S INCOMPETENCY DURING APPELLATE PROCEEDINGS.

Of this claim, petitioner's counsel write:

> Citing *Brady v. Maryland*, 373 U.S. 83 (1963), and related cases, petitioner argues his constitutional due process rights were violated in the following manner:
>
> the findings by the chief psychologist at the Disciplinary Barracks that petitioner suffered from several mental defects and lacked the mental capacity to assist his counsel;[26]
>
> evidence reflecting how and by whom those formal findings were altered to indicate that they were only "initial draft findings," Answer [government brief] at 13, and;
>
> evidence that military authorities pressured the sanity board to ultimately find petitioner competent despite his actual incompetency.

(Pet'r. Br. 30-34) (internal subparagraph markings omitted).

The petition further alleges that the government's failure to disclose such evidence materially affected the outcome of the appeal, by *inter alia*, causing petitioner to be deemed competent when he was not, and by inducing appellate counsel to rely on inaccurate and misleading information in determining whether to

---

[26] Dr. Kea's individual evaluation, previously described in the background section.

formally challenge petitioner's competency and in determining the scope of their own mental health investigation. (Pet'r. Br. 30-34).

We addressed the issue of post-trial discovery rights in *United States v. Hawkins*, 73 M.J. 640 (Army Ct. Crim. App. 2014), *pet. den.*, 75 M.J. 319 (C.A.A.F. 2016), but, as that case involved discovery rights before convening authority action, we did not conclude whether an appellant continues to enjoy those rights on direct appeal. We need not decide that question now,[27] because the facts make clear that at least one of petitioner's appellate defense counsel was provided Dr. Kea's initial report. In light of the fact that the initial report was disclosed to petitioner's appellate defense counsel and appended to their motion to this court to order a sanity board, we need not decide whether, under the facts and circumstances of this case, the report was in the prosecution's actual or constructive control. *See United States v. Stellato*, 74 M.J. 473 (C.A.A.F. 2015) and *United States v. Shorts*, 76 M.J. 523 (Army Ct. Crim. App. 2017).

At the request of CPT JS, petitioner's first appellate defense counsel, Dr. Kea performed the initial evaluation. Seizing on CPT JS's 11 December 2009 declaration that he completed his Army service before receiving it, petitioner's counsel conflate that specific fact into a wider-ranging allegation that the evaluation was not provided to "appellate defense counsel." This averment is fundamentally incorrect, for as a matter of fact obvious from the appellate record, Dr. Kea's evaluation, including his individual conclusions regarding petitioner's mental responsibility and competence, *were provided* to CPT MJB, CPT CGW, and CPT JJF, who succeeded CPT JS as petitioner's appellate defense counsel and submitted the same evaluation in support of their motion for another sanity board.

Petitioner also argues his due process rights were violated because Dr. Kea did not provide the initial report to Dr. Edwards, another member of the appellate sanity board. In his 25 November 2009 affidavit, Dr. Kea writes, *inter alia*:

> Prior to the actual convening of the sanity board, Dr. Marceau and I had met to review my findings from my original evaluations of [petitioner], which were in response to the lawyer's [CPT JS's] request for a sanity inquiry. Dr. Marceau would not agree to my findings and insisted that we rewrite the conclusions of my report. His position was that we needed further testing before drawing

---

[27] The Supreme Court addressed the matter in a civilian criminal case, *District Attorney's Office for Third Judicial District v. Osborne*, 557 U.S. 52 (2009). *See also United States v. Webb*, 66 M.J. 89, 92 (C.A.A.F. 2008) (re-stating constitutional and statutory rights to discovery and disclosure).

19

> the conclusions that I had drawn - that [petitioner] was incompetent and suffered severe mental defects - from the clinical interviews and testing I had already done.  Since Dr. Marceau was a psychiatrist, i.e., a medical doctor, and therefore considered more authoritative in the military setting, I agreed to change the conclusions while we did further evaluations and testing.  We changed the report to reflect that "at the time of the alleged criminal conduct, the accused may have had a severe mental disease or defect" and that it was unclear whether [petitioner] was competent to cooperate with the defense.  We both signed the report, which was submitted in response to the initial request for a sanity inquiry.  Although the history and findings of my initial evaluation were included with the board's final report, the last page of my initial findings was not included.
>
> [....]
>
> We conducted an interview of [petitioner] in the Discipline and Adjustment Board room at the Disciplinary Barracks.  Immediately after the interview, he was removed from the room.  Dr. Edwards, Dr. Marceau and I began deliberations, which lasted about an hour or so.  We basically sat in the room and discussed what our final findings should be.  For a sanity board report, it was my understanding at the time that all findings must be unanimous.  I still agreed with my original assessments as laid out above.  However, I was persuaded to agree with Dr. Marceau's conclusions.  I felt pressure to agree to Dr. Marceau's conclusions that [petitioner] did not suffer mental disease or defect at the time of the crimes and that he was competent.  Dr. Edwards, who is a medical doctor, played little part in our ultimate conclusions regarding Mr. Gray's mental status.  Ultimately, we prepared a final sanity board report that altered the conclusions that I had reached on my own.

In Dr. Edwards's 25 September 2009 affidavit, she writes she was unaware of Dr. Kea's initial individual report regarding petitioner's mental responsibility and competence.  She further states, "I would have found it absolutely appropriate to reconsider the final findings at the time in light of the original, undisclosed report of Dr. Kea."

Dr. Kea was clearly able to share his initial report with Dr. Marceau, and he did so. Nothing in his affidavit indicates he was unable to share it with Dr. Edwards once the sanity board convened. We also note that while Dr. Kea did not specifically write whether he verbalized his initial conclusions during the sanity board's deliberations, he did write: "I still agreed with my original assessments []." Finally, contrary to inferences urged by petitioner, nothing from Dr. Kea's affidavit raises concern that he was improperly influenced in his apparent decision not to provide his initial report to Dr. Edwards.

Noting that a sanity board "is a creature not of statute, but of executive order and long-standing military practice," our superior court described their non-judicial nature in *United States v. Best*, 61 M.J. 376, 382 (C.A.A.F. 2005):

> As an administrative board, whose members are typically appointed by a medical commander and not by the convening authority, and whose findings do not bind the court-martial in its determination of either competence (R.C.M. 909(e)) or mental responsibility (R.C.M. 916(k)(3)(C) and 921 (c)(4)), a board convened under R.C.M. 706 cannot be analogized to a court of members. For example, doctors serving on an R.C.M. 706 board would not only be granted access to an appellant's prior medical records, including previous diagnoses by other doctors, but would be encouraged to read those prior records to develop a full picture of an appellant's mental history.

Consistent with the majority in *Best*[28] and similarly mindful of the "important protections afforded by R.C.M. 706," we perceive no constitutional due process right governing the methods with which a sanity board performs its work. Assuming *arguendo* such a right does extend to such administrative evaluations, we perceive no due process violation here. The multiple boards in this case were conducted by neutral and independent professionals, and neither Dr. Kea's nor Dr. Edwards's affidavits disturb our confidence that the sanity board on which they served rendered a fair and impartial assessment of petitioner.

3. PETITIONER WAS DENIED HIS RIGHTS TO DUE PROCESS, TO A FAIR SENTENCING PROCEEDING, TO A PUBLIC TRIAL, AND AGAINST CRUEL AND UNUSUAL PUNISHMENT, AS GUARANTEED BY THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, WHERE THE PRESIDENT, ACTING IN A JUDICIAL ROLE, APPROVED PETITIONER'S DEATH SENTENCE IN

---

[28] *But see Best*, 61 M.J. at 390 (Baker, J., concurring).

RELIANCE UPON CONFIDENTIAL REPORTS THAT WERE NOT DISCLOSED TO PETITIONER.

As described above, we may only consider *coram nobis* relief based upon alleged errors in the trial of the case and our own previous direct review. *Denedo II*, 556 U.S. at 912-13. Petitioner's complaint here focuses on an event occurring years after this court affirmed the findings and sentence. We lack jurisdiction under Article 66, UCMJ, and authority under The All Writs Act to assess the legal sufficiency of the President's action in this case. 28 U.S.C. § 1651(a). While we are thus precluded from considering what appears to be the *sine qua non* of petitioner's claim—that the President's approval of the death sentence was a judicial action—this characterization further illustrates our jurisdictional limit, for we have no authority to render judgment on a superior court's decision.

4. PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT HIS CAPITAL SENTENCING.

For reasons that this and our superior court have previously provided, petitioner has failed to establish existence of the claimed error. *Gray CAAF*, 51 M.J. at 19; *Gray ACCA I*, 37 M.J. at 745-47. We additionally resolve the fifth *Denedo I* factor against petitioner, for this claim seeks to re-litigate an issue previously decided against him by this and our superior court. *Id.*

5. APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE.

Petitioner's counsel describe this claim as:

> incorporat[ing] the allegations in Claim 4 and provid[ing] an alternate ground for relief - that appellate counsel were ineffective in failing to present the results of a thorough mitigation and mental health investigation to establish defense counsel's ineffectiveness at trial.

Elevating his previously unsuccessful claims of ineffective assistance at trial to ineffective assistance on appeal, petitioner avers his appellate defense counsel were deficient by not providing background biographical information sufficient for his appellate-level R.C.M. 706 board to make a reasoned decision regarding his mental responsibility and capacity. We have fully considered petitioner's submissions, including an affidavit from Dr. Kea, who wrote in 2009, after reviewing matters later provided to him by petitioner's current counsel:

> [M]y original findings were largely correct. Indeed, [petitioner] did suffer from severe mental disease at the time of the criminal conduct. Moreover, it is equally clear

> that, as I stated in my initial report, [petitioner] was unable to appreciate the nature and quality or wrongfulness of his conduct, and did not have the mental capacity to cooperate intelligently with the defense at either the time of trial or at the time of the sanity board and appellate proceedings.

Even assuming Dr. Kea gathered insufficient information to reliably diagnose petitioner, such a shortcoming does not mean appellate defense counsel were deficient—and, we perceive no deficiency otherwise. We additionally note that in the neuropsychological evaluation ordered by this court and conducted by Dr. Brown, appellate counsel appears to have actively facilitated sharing petitioner's life history with the diagnostician in order to obtain a well-informed result.

6. PETITIONER'S DEATH SENTENCE MUST BE REVERSED BECAUSE THE MILITARY DEATH SENTENCING SYSTEM AS APPLIED IS UNCONSTITUTIONAL AND HIS SENTENCE WAS THE RESULT OF RACIAL DISCRIMINATION, IN VIOLATION OF ARTICLE 66 AND THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

We are keenly aware of our duty to remain vigilant in "eradicat[ing] racial prejudice from our criminal justice system." *McCleskey v. Kemp*, 481 U.S. 279, 309 (1987) (citing *Batson v. Kentucky*, 476 U.S. 79, 85 (1986)). Petitioner relies on *McCleskey*, in which the Supreme Court addressed a habeas claim that petitioner's death sentence was the result of racial discrimination in violation of the Constitution's Equal Protection Clause and Eighth Amendment. The petitioner in that case cited a statistical study led by Professor David Baldus, offering it to show disparities in capital sentencing outcomes based on defendants' and victims' races. Denying relief, the Supreme Court summarized petitioner's effort to meet his burden to establish an equal protection violation:

> [T]o prevail under the Equal Protection Clause, [petitioner] must prove that the decisionmakers in *his* case acted with discriminatory purpose. He offers no evidence specific to his own case that would support an inference that racial considerations played a part in his sentence. Instead, he relies solely on the Baldus study.

*McCleskey*, 481 U.S. at 292-93.

Petitioner bears the same burden here, and he too relies upon a study prepared by Professor Baldus—albeit a different one based on selected military justice cases—offered to show disparate outcomes in capital cases based on accuseds' and

victims' races. Assuming *arguendo*[29] the study is statistically sound, it falls far short of proving that "the decisionmakers in his case acted with discriminatory purpose." We find no other support for his claim that his sentence was motivated by racial discrimination and therefore constitutionally or statutorily infirm.

7. THE MILITARY DEATH PENALTY VIOLATES EVOLVING STANDARDS OF DECENCY UNDER THE EIGHTH AMENDMENT.

Petitioner bases this claim upon alleged racial disparities in military capital cases, excessive delays between sentence and execution, and the decreased use of capital punishment nationwide. His claim merits neither additional discussion nor relief. *See United States v. Loving*, 41 M.J. 213 (C.A.A.F. 1994); *United States v. Gray*, 51 M.J. 1, 11 (C.A.A.F. 1999); *United States v. Akbar*, 74 M.J. 364 (C.A.A.F. 2015); and *United States v. Hennis*, 75 M.J. 796 (Army Ct. Crim. App. 2016).

NOW, THEREFORE, IT IS ORDERED:

1. Petitioner's motion for oral argument is DENIED.

2. With respect to Claims 1, 2, 4, 5, 6, and 7, the petition is DENIED.

3. With respect to Claim 3, the petition is DISMISSED for lack of jurisdiction.

4. Respondent's motion to dismiss is DENIED as moot.

---

[29] Table 1 of the study provides "Thumbnail Sketches" of "Death Sentenced Accused Listed by Year of Sentence and Type of Offense: United States Armed Forces (1984-2005)." Certain cases are described as "brutal." For reasons unknown to us, petitioner's is not so described. Petitioner raped, forcibly sodomized, and murdered two people, stabbing one multiple times and shooting the other four times. *Gray ACCA I*, 37 M.J. at 736.

The study purports to implement "Criminal Culpability" controls, with no meaningful explanation of their provenance. However, a footnote at Table 12 of the study does offer some insight into the method involved: "The accused culpability levels reflect law student rank order scores based on their evaluation of detailed narrative summaries of the cases."

GRAY—ARMY MISC 20160775

Chief Judge RISCH, Senior Judge TOZZI, Senior Judge CAMPANELLA, Judge HERRING, Judge CELTNIEKS, Judge FEBBO, Judge BURTON, and Judge WOLFE concur.

FOR THE COURT:

JOHN P. TAITT
Chief Deputy Clerk of Court