CORRECTED COPY

# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before the Court Sitting *En Banc*

**UNITED STATES, Appellee**
**v.**
**Chief Warrant Officer Two LAMONT S. JESSIE**
**United States Army, Appellant**

ARMY 20160187

Headquarters, 1st Cavalry Division
Rebecca Connally, Military Judge
Lieutenant Colonel Oren McKnelly, Staff Judge Advocate (pretrial)
Lieutenant Colonel Scott E. Linger, Staff Judge Advocate (post-trial)

For Appellant:  Captain Heather M. Martin, JA (argued); Lieutenant Colonel Tiffany M. Chapman, JA; Captain Joshua B. Fix, JA (on brief);  Lieutenant Colonel Tiffany D. Pond, JA; Captain Zachary Gray, JA; Captain Heather M. Martin, JA (on reply brief);  Captain Zachary Gray, JA; Captain Heather M. Martin, JA (on supplemental brief).  Lieutenant Colonel Tiffany D. Pond, JA; Major Todd W. Simpson, JA; Captain Zachary Gray, JA; Captain Heather M. Martin, JA (on second supplemental brief).

For Appellee:  Captain Marc B. Sawyer, JA (argued); Colonel Tania M. Martin, JA; Major Michael E. Korte, JA; Captain Marc B. Sawyer, JA (on brief);  Colonel Steven P. Haight, JA; Lieutenant Colonel Eric K. Stafford, JA; Major Hannah E. Kaufman, JA; Captain Marc B. Sawyer, JA (on supplemental briefs).

28 December 2018

--------------------------------
MEMORANDUM OPINION
--------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

WOLFE, Senior Judge:

Chief Warrant Officer Two (CW2) Lamont S. Jessie asks us to find that his sentence is inappropriate.[1]  Based on matter submitted for the first time on appeal,

---

[1] Appellant also asserts that his sentence is inappropriate because of unreasonable

(continued . . .)

appellant argues that we should use our Article 66(c), UCMJ, authority to reduce his prison sentence because of his conditions of confinement. Specifically, appellant argues that the confinement facility's visitation rules violate his First and Fifth Amendment rights by depriving him of contact with his biological children. We determine this is not an appropriate use of our Article 66(c) authority.

An officer panel sitting as a general court-martial convicted appellant, contrary to his pleas, of two specifications of sexual assault of a child over the age of twelve but under the age of sixteen, one specification of conduct unbecoming an officer, and one specification of adultery, in violation of Articles 120b, 133, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 920b, 933, and 934 (2012) [UCMJ]. The panel sentenced appellant to a dismissal from the service, confinement for four years, and a reprimand. The convening authority approved the adjudged sentence.

## BACKGROUND

After being convicted of a sexual offense against a child, appellant has been denied any form of contact with his children while in military confinement.

### A. *The Offense*

In June 2012, in anticipation of deployment, appellant moved his family from Georgia to Oklahoma.[2] To save money, appellant moved in with his close friend Staff Sergeant (SSG) LE and her family. The family consisted of SSG LE, her husband Sergeant First Class (SFC) SE, and their two daughters TE and ME. The family lived in a three bedroom apartment, with the master bedroom on one side of the apartment and the other two bedrooms next to each other on the other side of the apartment. While staying with SSG LE's family, appellant stayed in a bedroom next to the children's bedroom. During this timeframe, appellant's daughter ZR came to visit appellant and stayed with him at SSG LE's house.

During appellant's stay with SSG LE's family, appellant began to have sex with thirteen-year-old TE. Appellant and TE continued to communicate after TE moved to Colorado and appellant deployed. Their communication consisted of text messages, phone calls, and video messaging.

---

(. . . continued)

post-trial delay. We disagree. We have also considered the matters personally asserted by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find they lack merit.

[2] Appellant is married and has two children with his wife. He also has a daughter, ZR, from his first marriage.

In September 2013, SSG LE discovered text messages between appellant and TE on TE's phone. She and her husband called appellant immediately to confront him about the messages. He did not deny the messages but said they were being misinterpreted. Staff Sergeant LE also confronted TE, who initially denied having sex with appellant. Staff Sergeant LE reported the incident to the police. In the course of the investigation, TE admitted to having sexual relations with appellant on several occasions.

At trial, the panel rejected appellant's argument that he was a platonic mentor to TE. We concur with the panel's weighing of the evidence. The panel sentenced appellant to a dismissal from the service, confinement for four years, and a reprimand.

*B. Conditions of Confinement*

In March 2016, appellant was sent to the Joint Regional Confinement Facility (JRCF) at Fort Leavenworth, Kansas, to serve his sentence. At the time, the JRCF policy on visitation was that inmates convicted of a child sexual offense could have no contact with any children – to include their biological children – unless they received an exception to policy. However, prior to an exception to policy being considered, an inmate was seemingly required to complete a treatment program for sexual offenders. To participate in the sexual offender treatment program, appellant complains would require admitting the conduct underlying the offense in question. This policy was codified in JRCF Regulation 600-1 and Military Correctional Complex Standard Operating Procedure (MCC SOP) 310.

Effective 7 November 2018, the policy was amended to allow prisoner contact with children under certain conditions and after an individualized assessment of the inmate's risk. This change in policy occurred after briefing by the parties, after oral argument on the case, and after several rounds of both parties moving to supplement the record with additional affidavits and evidence. We do not know whether appellant will be allowed direct or indirect contact with his children under the new policy.

For the purposes of considering this assignment of error, we limit our review to the policy as it existed from when appellant arrived at the confinement facility in March 2016 until the policy was amended in November 2018.[3]

---

[3] We see no substantive differences between the applicable versions of MCC SOP 310 during this timeframe. As such, we do not need to stratify our analysis and assumptions.

Within this timeframe, we will assume for our purposes that MCC SOP 310 prohibited all direct and indirect contact with appellant's biological children. We further assume that appellant has exhausted all administrative means of challenging the policy.[4]

## DISCUSSION

### A. *The limits of our authority*

Appellant alleges that the confinement facility policies prohibiting him from seeing his biological children were unconstitutional, at least as applied to him. As a preliminary matter, we briefly discuss this court's limited remedies.

This court has no authority to direct change to the policies of military confinement facilities. Indeed, we have no authority to supervise the practice of military justice generally. *See Clinton v. Goldsmith*, 526 U.S. 529 (1999). Regardless of how infamous or heinous the alleged constitutional violations might be, we may not order injunctive relief directing the facility to amend its policies.

This lack of authority reflects that the responsibility of administering the military justice system is shared between commanders, staff judge advocates, military judges, and others. *See, e.g., Bergdahl v. Burke*, ARMY MISC 20150624, 2015 CCA LEXIS 431 (Army Ct. Crim. App. 8 Oct. 2015); *United States v. Walker*, ARMY 20160239, 2018 CCA LEXIS 506 (Army Ct. Crim. App. 22 Oct. 2018); UCMJ arts. 26(a), 27(b)(2), 69, and 73 (responsibilities of the Judge Advocate General in designating military judges, certifying the qualifications of counsel, conducting appellate review, and acting on petitions for new trials); UCMJ arts. 32, 34, 60, 71, and 138 (responsibilities of convening authorities in appointing preliminary hearings, referring cases to trial, approving and executing sentences, and hearing complaints against commanding officers).

Our authority, which is delineated by Article 66, UCMJ, is to determine the correctness of the case in front of us. More technically, we "may act only with respect to the findings and sentence as approved by the convening authority." Article 66(c), UCMJ. Ordering a prison commandant to change a prison policy, for example, would not be acting on the findings and sentence. We have found no authority to the contrary. Indeed, appellant acknowledges our limitations and instead asks this court to reduce his sentence in light of the confinement policies to which he was subjected.

---

[4] To our knowledge, appellant has not sought injunctive relief from a court of competent jurisdiction.

The November 2018 intervening change to the prison policy does not alter our analysis. Even assuming that recent policy changes would moot appellant's claim going forward, appellant was subjected to the old policy for an extended period of time. If this would warrant sentence relief, the fact that the policy has been modified would not alter the appropriateness of appellant's sentence.

Accordingly, we next address our authority to grant appellant's requested relief.

*B. May we consider sentencing matter submitted for the first time on appeal?*

In *United States v. Gay,* our sister court at Joint Base Andrews considered whether to reduce the accused's sentence based on post-trial conditions of confinement. 74 M.J. 736 (A.F. Ct. Crim. App. 2015). After considering that the accused was unnecessarily placed in solitary confinement, the Air Force Court determined the sentence was too severe and cut it in half. *Id*. "A court-martial shall not adjudge a sentence to solitary confinement . . . ." Rule for Courts-Martial (R.C.M.) 1003(b)(7).

Upon certification, *see* Article 67(a)(2), the Court of Appeals for the Armed Forces (CAAF) was asked to determine whether the Courts of Criminal Appeals (CCAs) have the authority under Article 66 to grant sentence appropriateness relief for post-trial confinement conditions that do not amount to cruel and unusual punishment. *United States v. Gay*, 75 M.J. 264 (C.A.A.F. 2016). The CAAF determined that the CCAs have "discretionary sentence appropriateness authority" and may reduce a sentence based on "a legal deficiency in the post-trial confinement conditions." *Id*. at 269.

Appellant persuasively argues that under *Gay* we may reduce appellant's sentence based on legal deficiencies in his post-trial confinement conditions. However, our understanding of *Gay* is shaped by a couple of other considerations.

First, in *Gay,* the accused's request for sentence relief was based on matter that was previously submitted to the convening authority. *See* 74 M.J. at 739-41. An accused's R.C.M. 1105 submissions are a proper means to place matter in the record for a CCA to consider when conducting a sentence appropriateness review. *See United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007). Here, by contrast, none of the matter submitted for our consideration was reviewed by the convening authority.

Second, in *Healy*, the CAAF stated, "Congress never intended that a Court of Military Review would be under any duty to receive additional information on sentencing after the convening authority had acted." 26 M.J. at 396-97. "[A]fter the convening authority has acted, the Code provides no way for bringing to the

5

attention of the Court of Military Review information that purportedly bears even on sentence appropriateness."[5]  *Id.* at 396; *accord United States v. Boone,* 49 M.J. 187, 193 (C.A.A.F. 1998) ("[*Healy*] lives in peace with our holding that consideration of sworn affidavits from counsel is a proper fact-finding act of a Court of Criminal Appeals.").

We therefore understand the CAAF's decision in *Gay* to be that the Air Force Court acted within its authority when it reduced the accused's sentence based on a legal deficiency in the post-trial confinement conditions, but not that the Air Force Court was obligated to reach that conclusion.  Accordingly, we will assume that we may consider appellant's submissions.

Thus, the issue for us to determine is not whether we "must" or "must not" consider appellant's post-trial confinement conditions when determining appellant's sentence appropriateness, the question is whether we *should.*

### C. Eighth Amendment and Article 55 cases distinguished

Before addressing whether we should consider matter submitted for the first time on appeal regarding the appropriateness of appellant's sentence, we first distinguish cases that involve claims of cruel and unusual punishment.

In *United States v. White*, 54 M.J. 469 (C.A.A.F. 2001), the Air Force Court had determined that it lacked jurisdiction to consider a claim that the accused was subject to cruel and unusual punishment while confined.[6]  Our superior court disagreed and stated the "grant of authority" under Article 67 includes "determin[ing] on direct appeal if the adjudged and approved sentence is being executed in a manner that offends the Eighth Amendment or Article 55."[7]  *Id.* at 472. The court went further and stated that Article 67 "includes authority to ensure that the severity of the adjudged and approved sentence has not been unlawfully increased by prison officials."  *Id.*  The CAAF found the CCA had erred in determining it lacked jurisdiction to consider the claim.  *Id.*; *see also United States v. Erby*, 54 M.J. 476, 478 (C.A.A.F. 2001) (finding the CCA erred when it concluded that it "lacked authority" to review appellant's claims of cruel and unusual punishment).

---

[5] And nor would it be appropriate for us to consider government submissions that showed an accused had been violent while confined.

[6] *See United States v. White*, ACM 33583, 1999 CCA LEXIS 220 (A.F. Ct. Crim App. 23 Jul. 1999).

[7] Because the CAAF in *White* found no violation, the court did not need to determine what the appropriate remedy would be under Article 67.

Here, appellant does not allege that he is entitled to relief for a violation of the Eighth Amendment or Article 55. Such a claim would require appellant to "prove, as an objective matter, that the alleged abuse or harassment caused 'pain' and, as a subjective matter, that the officer in question acted with a sufficiently culpable state of mind." *White*, 54 M.J. at 474 (quoting *Freitas v. Ault*, 109 F.3d 1335, 1339 (8th Cir. 1997)). This is an exceptionally hard standard to meet. Nothing we have reviewed leads us to fault appellant for not raising an Eighth Amendment or Article 55 claim.

We do not read *White* or *Erby* as establishing an exception or overruling *Healy*. That is, we do not read the Article 55 cases as establishing that we must consider all matter affecting sentence appropriateness submitted for the first time on appeal. Specifically, we do not read *White*, *Erby*, (or *Gay*) as *requiring* this court to consider all post-trial submissions, not part of the authenticated record, as long as they can be framed as asserting a legal deficiency in the post-trial confinement conditions.[8] Such an interpretation would require that we read *Healy* as being implicitly overturned. This we may not do. *United States v. Davis*, 76 M.J. 224, 228 n.2 (C.A.A.F. 2017).

A "legal deficiency" may be constitutional, statutory, or regulatory. We have found no case where our superior court, outside of Article 55 claims, has ever stated that we are required to determine the appropriateness of a sentence based on a claim of a legal deficiency: (1) following the convening authority's action; and (2) based on matters submitted for the first time on appeal.

---

[8] All manner of problems can be framed as a legal deficiency, and have included the following (in just one case): (1) inadequate cell ventilation; (2) improper cell lock-down averaging 9 1/2 hours per day; (3) presence of lead paint; (4) unsanitary food preparation, storage, dining, and dishwashing; (5) crowded and noisy dining area; (6) insufficient time to consume meals; (7) improper cell assignment with inmates known to be violent; (8) housing with inmates who are known to have tuberculosis or HIV; (9) requirement for military haircuts; (10) excessive scrutiny while using bathroom, showering, and changing clothes; (11) the requirement to stand at attention and render formal military courtesies; (12) the inability to refuse to take prescribed medication; (13) medications dispensed by unqualified and untrained personnel; (14) mattresses not cleaned or sterilized between users; (15) insufficient smoke or fire detection equipment; and (16) excessive USDB phone call rates. *Marrie v. Nickels,* 70 F. Supp. 2d 1252, 1255-56 (D. Kan. 1999).

D. *Should we consider appellant's post-trial submissions and claims?*

If we *may* consider appellant's claims for post-trial sentencing relief, but are not required to, the question next becomes whether we *should*. For several reasons, we think not in this case.

Starting broadly, the Supreme Court of the United States has stated "courts are ill equipped" to review problems regarding prison administration, and that it is not "wise for [a court] to second-guess the expert administrators on matters on which they are better informed." *Bell v. Wolfish*, 441 U.S. 520, 531, 544 (1979) (quoting *Wolfish v. Levi*, 573 F.2d 118, 124 (2nd Cir. 1978)); *see also Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 128 (1977); *Procunier v. Martinez*, 416 U.S. 396, 404-05 (1974); *Cruz v. Beto*, 405 U.S. 319, 321 (1972); *Meachum v. Fano*, 427 U.S. 215, 228-29 (1976). "Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547.

Courts do sometimes review conditions of confinement – and sometimes must. The Supreme Court's guidance cited above is a call for caution, not abdication. But we nonetheless think this case remains unsuitable for an Article 66(c) sentence appropriateness assessment.

Were we to find appellant's claim meritorious, we would then need to determine whether to reduce appellant's sentence. That is, we would need to determine not only that the previous version of MCC SOP 310 was wrong, but also weigh the degree of wrong. We would essentially determine (even if left unstated in the opinion) what the confinement facility policy for child sex offender contact with children should be. The effect, and perhaps the intended effect according to the dissent, would be for this Article I Court to use our authority to lower sentences to force (or at least heavily incentivize) a change in policy we find offensive. Our Article 66(c) sentence appropriateness power is a poor tool for such an endeavor.

Additionally, this case is distinguishable from *Gay*. In *Gay,* the Air Force Court was not asked to review the correctness of published policies and regulations. The evidence in *Gay* was that the accused was placed in solitary confinement, at the direction of Air Force personnel, "without explanation" and for "[n]o valid reason." 74 M.J. at 739, 743. And since a court-martial may not sentence an accused to solitary confinement, R.C.M. 1003(b)(7), the Air Force Court did not have to think too hard in resolving the matter. *Gay* is a case where procedures were *not* followed. Thus, while a CCAs sentence appropriateness power might have been the appropriate tool in *Gay*, that does not mean it is the right one here.

8

Relatedly, there are four Courts of Criminal Appeals. Assuming we weighed in (to whatever greater or lesser extent) as to what is an appropriate policy for child sex offender contact with children, our opinion would be co-equal with the appellate judges of our sister courts. A prison official should not be expected to respond to four different courts or operate different policies for prisoners depending on their service.

And then, even were we to attempt to use sentence appropriateness review to effect policy change, it is a blunt tool. Were we to reach appellant's claim, the legality of MCC SOP 310 would be only a small part of our overall sentence appropriateness review. We must first consider appellant's crimes and the sentencing evidence introduced at trial. If we determined that appellant's adjudged sentence was lenient, we might approve appellant's sentence notwithstanding that we agree with his claims about his post-trial confinement conditions.

We must also give some consideration to the statutory limits of our authority. Were we to act on appellant's claim, we would be at the outer edge of our authorizing statutes. Consider the following textual limitations:

(1) Article 54(a), UCMJ, states that each court-martial "shall keep a separate record" and that "the record shall be authenticated by the signature of the military judge." Here, we are being asked to reduce a sentence based entirely on a record that was never authenticated by the military judge, based on information that was neither adversarially tested nor admitted under the Military Rules of Evidence.

(2) Article 66(c) requires that when "considering the record" to determine whether a sentence "should be approved," we must recognize that the trial court saw and heard the evidence. Here, we are asked to determine whether the sentence should be approved based on information that neither the convening authority nor the trial court ever saw.

(3) And, our authority under Article 66(c) is limited to the findings and sentence as approved by the convening authority. But here, we are asked to provide relief based on conduct that happened *after* the convening authority approved the sentence.

Now, *Gay* can be understood as extending our authority to consider such matter.[9] If correct, then these considerations are not dispositive nor jurisdictional.

---

[9] It is not clear whether the CAAF's decision in *Gay* would be different if the evidence of the accused's solitary confinement had been submitted for the first time on appeal, rather than, (as it appears from the CCA opinion), having been submitted to the convening authority.

But to the extent that we have discretion, the farther we get from our core function under Article 66(c), the greater the argument for demurral.

Lastly, appellant's claim inevitably involves determining the outer limits of what is an acceptable prison policy for familial contact by convicted child sex offenders. That we might consider the claim does not mean we should. This is a claim we are poorly positioned to consider, and that within the structure of the military justice system is better entrusted to a determination by persons other than this Article I court.

Setting aside the broader policy concerns and looking more narrowly at the facts of this case, we reject appellant's claim that the record shows he poses no threat to his children and that he therefore should have a reduced sentence. We find as fact[10] that appellant committed a sexual crime against a close family friend. We further find that appellant used the excuse of babysitting his daughters to invite Ms. TE to Texas where he intended to continue his sexual exploitation. That is, appellant attempted to use his daughters to play some role in a plan for the continued sexual exploitation of Ms. TE. Appellant's daughters are now (or soon will be) about the same age as Ms. TE was when appellant acted on his sexual attraction towards a minor.

These findings do not mean that appellant has forever forfeited all rights to familial association. But it does mean that we should not presume how appellant would fare when given an individualized risk assessment. If an assessment reveals that appellant should be denied all access to his children, then appellant has suffered no prejudice under any policy.

In other words, the amount of any sentencing relief appellant might be due will likely turn on whether he would be allowed to have contact with his children under the new policy. (And of course appellant may then complain that the new policy is also unconstitutional or is being unconstitutionally applied). To grant relief today would require us to either speculate about the outcome of the confinement facility's resolution of appellant's future individual assessment,[11] or delay making a decision until the record is more developed. If there was no other

---

[10] We may make factual findings based on the record. *See* Article 66(c), UCMJ. We may not make credibility determinations based on post-trial affidavits. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997). Our findings here are based on the evidence that was litigated at trial, and therefore fall outside of *Ginn*.

[11] Our superior court has stated that we may not order relief to avoid determining whether there is error. *See United States v. Fagan*, 59 M.J. 238 (C.A.A.F. 2004).

forum for appellant to seek relief from a policy he claims is unconstitutional, this latter course of action might be appropriate.

But here, to the extent that appellant's claims are meritorious, there exists a court that has the authority to order actual (i.e., injunctive) relief. The Tenth Circuit has determined that military prisoners at Fort Leavenworth may file suit in U.S. District Court seeking injunctive and declaratory relief for oppressive prison conditions. *See Walden v. Bartlett*, 840 F.2d 771, 774-75 (10th Cir. 1988) (finding such requests are not specifically barred by *Feres v. United States*, 340 U.S. 135 (1950)). And the ability to grant injunctive and declaratory relief are not the only benefits. Our jurisdiction over this case exists only during the snapshot in time between when the convening authority acts and when we issue our judgment. A U.S. District Court is not so constrained. Likewise, similar claims for prisoners of different services can be considered by a federal district court, rather than by four different service courts of criminal appeals. And, to the extent that the CCAs and a federal district court are asked to address the same issue, this might invite confusion.[12]

Accordingly, we determine that in this case we should not consider appellant's post-trial submissions in his claim for sentencing relief. Our decision today is case specific, and should not be understood as prohibiting or disincentivizing similar (or dissimilar) requests.[13] Article 66(c) requires individual consideration of each case.

Nor should our conclusion be in any way interpreted as a validation (tacit or otherwise) of the previous version of MCC SOP 310. Those in command of military prisons should execute their duties faithfully, regardless of the presence or absence of any judicial finger-wagging.

---

[12] In at least one case, we have found ourselves in a do-loop with the federal court; each court not acting because the other had not yet acted. *Gray v. Belcher*, No. 5:08-cv-03289-JTM, 2016 U.S. Dist. LEXIS 149574 (D. Kan. 26 Oct. 2016) (declining to consider coram nobis claim because ACCA had not yet acted); *Gray v. United States*, 76 M.J. 579 (Army Ct. Crim. App. 2017) (declining to grant relief because of the availability of relief in the Kansas district court). The do-loop was only terminated when our superior court declared Gray's military appeals complete. *United States v. Gray*, 77 M.J. 5 (C.A.A.F. 2017).

[13] We specifically commend appellate defense counsel for the stellar quality of their representation.

## CONCLUSION

Upon reconsideration by the court en banc, the parties' motions to attach documents that relate to MCC SOP 310 and the restrictions on appellant's familial visitation rights are DENIED.[14]

Upon consideration of the record, the findings of guilty and the sentence are AFFIRMED.

Senior Judge MULLIGAN, Judge FEBBO, Judge SALUSSOLIA, Judge ALDYKIEWICZ, and Judge FLEMING concur.

---

[14] Our reconsideration on the motions does not remove the documents from the file, nor do we seek to prevent our dissenting colleagues from referring to documents that they would both admit and consider.

JESSIE—ARMY 20160187

Judge FEBBO, concurring:

I fully concur with the majority's result. I write separately to raise my concern that we would actually go beyond the outer edge of our Article I authority if we were to reduce appellant's sentence because, for the first time on appeal, appellant challenges the constitutionality of the prison's sexual offender treatment and child access policy.

Given the historic lows in the number of courts-martial cases, I am not worried about flooding the appellate process nor the sky falling. *See* Hagler, J., dissenting, *infra*. Instead, I am concerned that we are entertaining crossing the horizon of our Article I jurisdiction as outlined in *Clinton v. Goldsmith*, 526 U.S. 529 (1999). If we have jurisdiction to reduce appellant's sentence, based on matter that was never raised at trial and was never presented to the convening authority, it is difficult to see how anything but the exercise of our own discretion (i.e. the measure of our own feet) limits the reach of our review under Article 66(c), UCMJ.

This new frontier of prisoner litigation could include, among other areas of the law, addressing 42 U.S.C. § 1983 civil rights claims, family custody and child welfare laws, and navigating the limits and rules that Congress established under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996). As military prisoners are sometimes kept in non-military facilities, our opinions in this area could purport to reach prison policies in the Federal Bureau of Prisons and state agencies.

Perhaps most troublesome, were this court to adopt an expansive view of what matter is properly before us, our decisions could also impact the government's legitimate interest in the safety and welfare of civilian children. In deciding family custody and visitation issues, our opinion could be misinterpreted. Social workers, family law attorneys, and others might not see that our opinion is technically limited to determining the appropriateness of appellant's sentence. There is some danger that such a decision by us could be misread by practitioners who are unfamiliar with military justice. After all, most courts do not go about declaring prison policies unconstitutional unless they have the authority to do something about it.

I believe that *United States v. Gay*, 75 M.J. 264 (C.A.A.F. 2016), is distinguishable in two significant ways from the facts of this case. First, *Gay* was a case in which the accused's conditions of confinement were directly raised to the convening authority. That is, the matter considered by the Air Force Court of Criminal Appeals in *Gay* was part of the sentence as approved by the convening authority. This is not the case here. Second, the policies at issue in this case are not comparable to the issues in *Gay*. Appellant asks us to go well beyond the authority to decide solitary confinement issues addressed in *Gay* with the potential to impact the safety and welfare of civilian children.

13

Our court has the wisdom and experience to make sentence appropriateness determinations of military courts-martial under Article 66(c). Our wisdom does not extend into this new horizon. Article III courts give us deference to decide military matters. Similarly, we should not reach into an area of the law that is the province of another court system.

Appellant's primary avenue of relief has always been in the more appropriate forum of an Article III court. Once raised, the federal court may or may not conclude that the prison policy is unconstitutional. Similarly, the federal court may also enjoin the prison from implementing its policy and therefore allow alternative telephonic and letter contact with children. However, before deciding the issue, the Article III court would have the benefit of depositions, civil discovery between the parties, and possibly a full evidentiary hearing. The Article III court would also have the benefit of having authority to order injunctive relief, enforce consent decrees between the parties, consider the wide-range application and consistency of Federal Bureau of Prison regulations, and order an agency to actually change its policy if unconstitutional.

Although the dissent recognizes our court does not have jurisdiction to control prison policy, it is clear that a change in policy would be the outcome of their ruling. Furthermore, the dissent's conclusion is reached on a limited appellate record with no evidentiary hearing, conflicting affidavits from experts, no actual exhaustion of administrative remedies, and not knowing the actual impact on the prison resources to screen telephone calls or letters.

*Turner v. Safley* provides a four part test, but it is a test best designed for a court that can actually grant injunctive relief. 482 U.S. 78 (1987). I think it highly unlikely that when writing *Turner*, the Supreme Court considered how an Article I, lower-intermediate appellate court would apply *Turner* in determining whether appellant's sentence should be approved.

It is true that our superior court has recognized our court as "the proverbial 800-pound gorilla" when protecting the rights of soldiers. *See* Schasberger, J., dissenting, *infra* (citing *United States v. Parker*, 36 M.J. 269, 271 (C.M.A. 1993)). However, in comparison to our ability to grant appellant actual relief, an Article III court is the proverbial M1A2 Abrams tank. For the purpose of providing appellant with the most appropriate relief, it is a tank loaded with the authority to potentially determine all of appellant's complaints in his favor. As an Article I court, we should let Congress decide whether to "uncage" our authority and allow us to wade into the constitutionality of prison regulations for sex offender treatment, scope of child sex offender communication with children, risk assessment for child sex offenders, and whether association and communication is in the best interest of protecting civilian children.

JESSIE—ARMY 20160187

Our Article 66(c) authority is indeed broad, powerful, and may sometimes be the last safeguard in providing a just military criminal justice system for an accused. But we should not fly too far from our statutory Article 66(c) authority. If we exceed our authority and fail to exercise restraint, we may instead have our wings clipped.

JESSIE—ARMY 20160187

Judge SCHASBERGER, dissenting, joined by Chief Judge BERGER, Senior Judge BURTON, and Judge HAGLER:

I respectfully dissent.

In reviewing Article 66(c), our superior court has described our court as "the proverbial 800-pound gorilla when it comes to their ability to protect an accused." *United States v. Parker*, 36 M.J. 269, 271 (C.M.A. 1993). I do not believe we should lock this gorilla in a cage when it comes to potential violations of an appellant's constitutional rights.

We have an obligation under Article 66(c), UCMJ, to only affirm "the sentence or such part or amount of the sentence as [we find] correct in law and fact and determine[], on the basis of the entire record, should be approved." That record primarily consists of evidence admitted at trial and prior to action, but we may also consider evidence of post-trial confinement conditions as part of our sentence appropriateness determination if there is a legal deficiency in those conditions. *United States v. Gay*, 75 M.J. 264, 267 (C.A.A.F. 2016).[15]

---

[15] The majority overstates the relevance and effect of *United States v. Healy*, 26 M.J. 394 (C.M.A. 1984), and ignores the underlying analysis in both *White* and *Erby*.

First, in *Healy*, our superior court concluded that we have "no duty to receive information or data that purports to be relevant *only to clemency*." *Id.* at 397 (emphasis added). This is not a clemency case. Unlike *Healy*, appellant is seeking sentence appropriateness relief based on "a legal deficiency in the post-trial confinement conditions." *Gay*, 75 M.J. at 269. The court in *Healy* perfectly explained the difference: while "clemency involves bestowing mercy – treating an accused with less rigor than he deserves," "sentence appropriateness involves the judicial function of assuring that justice is done and that the accused gets the punishment he deserves." 26 M.J. at 395.

Second, in both *White* and *Erby*, the CAAF rejected the Air Force Court's conclusion that it lacked jurisdiction. 54 M.J. 469, 472 (C.A.A.F. 2001); 54 M.J. 476, 478 (C.A.A.F. 2001). Notably, in reaching this conclusion, the Air Force Court relied on its prior decision in *United States v. Haymaker*, 46 M.J. 757 (A.F. Ct. Crim. App. 1997). *See United States v. White*, ACM 33583, 1999 CCA LEXIS 220, at *2-3 (A.F. Ct. Crim. App. 23 Jul. 1999); *United States v. Erby*, ACM 33282, 2000 CCA LEXIS 120, at *3 (A.F. Ct. Crim. App. 14 Apr. 2000). The analysis in *Haymaker* is strikingly similar to the majority's analysis in this case. Among other things, *Haymaker* stated "we are not the appropriate forum for this complaint," "the conditions of confinement are . . . not in the record of trial," "the question of matching the remedy to the specific injury alleged is by no means incident to our discussion as to the appropriateness of our consideration of appellant's complaint,"

(continued . . .)

16

I agree with the majority that *Gay* does not require that we review every possible post-trial submission. I respectfully disagree with the majority, however, that we should ignore appellant's claims that violations of his First and Fifth Amendment rights have led to an increase in his sentence.[16]

In *Overton v. Bazzetta*, 539 U.S. 126 (2003), the Supreme Court addressed a prison regulation which limited visitation. The Court acknowledged the Constitution protects certain relationships and, "outside the prison context," the right to maintain certain familial relationships. *Id*. at 131. Though the Court acknowledged that "[s]ome curtailment of [the freedom of association] must be expected in the prison context," the Court also carefully explained, "We do not hold, and we do not imply, that any right to intimate association is altogether terminated by incarceration or is always irrelevant to claims made by prisoners." *Id*.

The fact that some right of association for prisoners survives was made clear by *Overton* applying the four factors from *Turner v. Safley*, 482 U.S. 78 (1987), which are used to determine "whether a prison regulation affecting a Constitutional right that survives incarceration withstands constitutional challenge." *Overton*, 539 U.S. at 132. The *Turner* factors are: "whether the regulation has a 'valid, rational connection' to a legitimate governmental interest; whether alternative means are open to inmates to exercise the asserted right; what impact an accommodation of the

---

(. . . continued)
and "to achieve a remedy tailored to the specific inadequacy alleged, the complaint should be brought to the forum or tribunal best positioned to do so." 46 M.J. at 760-61. While *White* and *Erby* involve Eighth Amendment and Article 55 claims (and are therefore not necessarily dispositive in this case), the CAAF's rejection of their reliance on *Haymaker* is noteworthy and lends strength to the notion that we should consider appellant's claim.

[16] As outlined below, I would find that appellant's First Amendment rights were violated. I would not, however, find that the policy violated appellant's Fifth Amendment rights. In *McKune v. Lile*, the Supreme Court noted that though the privilege against self-incrimination "does not terminate at the jailhouse door," choices that might infringe those rights outside the prison context "fall within the expected conditions of confinement of those who have suffered a lawful conviction." 536 U.S. 24, 36 (2002) (Kennedy, J., plurality opinion). Given that courts have found no Fifth Amendment violation in policies that are stricter than the one in question here, I would conclude that appellant's Fifth Amendment rights were not violated.* *See, e.g., Roman v. Diguglielmo*, 675 F.3d 204 (3rd Cir. 2012); *Ainsworth v. Stanley*, 317 F.3d 1 (1st Cir. 2002).

* Corrected

right would have on guards and inmates and prison resources; and whether there are 'ready alternatives' to the regulation." *Id.* (quoting *Turner*, 482 U.S. at 89-91).

To properly apply the *Turner* factors, one must take a closer look at the relevant facts in this case.[17]

In March 2016, appellant was sent to the JRCF at Fort Leavenworth, Kansas, to serve his sentence. At the time, the JRCF policy on visitation was that inmates convicted of a child sexual offense could have no contact with any children – to include their biological children – unless they received an exception to policy. However, prior to an exception to policy being considered, the inmate was required to admit guilt and complete a treatment program for sexual offenders.

This policy was codified in MCC SOP 310 and JRCF Regulation 600-1. The MCC SOP 310 explained the policy was designed to preclude any "written, telephonic or in-person contact with any minor child" without the necessary exception to policy. JRCF Regulation 600-1 clarified this restriction precluded having contact "in-person, written, telephonic, *directly or indirectly* with any child under the age of 18 years old." (emphasis added).

In March 2017, appellant submitted an MCC Form 510 asking for information on how he could have contact with his children. In response to his request, appellant was told that "[f]acility protocol" precluded such contact, as "individuals with child victims in sex offense cases are not permitted contact with children until they complete sex offender treatment. You are not currently eligible for sex offender treatment as you do not take responsibility for your confining offense."

In June 2017, appellant submitted a request for redress under Article 138, UCMJ, stating that he had not been allowed to speak to his children. In denying this request, appellant's commanding officer cited JRCF Regulation 600-1, noting that the regulation precludes inmates convicted of sexual offenses with children from having any direct or indirect contact with minor children unless they have prior approval of the Deputy to the Commander. Appellant's commanding officer also concluded that filing an Article 138 complaint was inappropriate since appellant could submit a request for exception to policy. The commanding officer did not explain how an exception to policy could ever be approved, as it required completion of the sex offender treatment for which appellant was "not currently eligible."

---

[17] I do not read *Healy* (or any other case) to preclude attachment of the documents submitted by the parties in this case. In order to properly conduct our Article 66(c) review for sentence appropriateness, I find it necessary to consider many of the documents that were previously attached to the record.

In his appeal to this court, appellant submitted a sworn affidavit. As attachments to his affidavit, appellant included his MCC Form 510, his Article 138 request for redress, and a letter from the mother of his oldest daughter which requested appellant be able to contact his daughter for the benefit of the child.

In its response, the government included an affidavit from Lieutenant Colonel (LTC) GW, the Director of the Directorate of Treatment Programs (DTP) for the MCC, cosigned by Ms. RJ, the Chief of the Rehabilitation Division. In his affidavit, LTC GW stated the government's basis for the policy. According to LTC GW, the policy was "created through consultation with expert leaders in the field of sex offender management and is in accordance with generally accepted best practices. MCC SOP 310 aligns with practice standards and guidelines of the Association for the Treatment of Sexual Abusers (ATSA) . . . ."

In response, appellant submitted an affidavit from Ms. MC, the Executive Director of ATSA. She stated that as part of their mission, ATSA produces practice standards and guidelines for the treatment and management of adult male sex abusers. In these guidelines, ATSA did not provide policy guidance for contact or visitation in an institutional setting. Instead, the guidelines state "unilateral strategies to manage the risk of individuals who may be at risk of offending do not meet best practice guidelines that promote community or institutional safety." As part of his filings, appellant also submitted evidence that he is able to sit in close proximity to children of other inmates in the JRCF visiting area, but he cannot similarly sit near his own children.

Following briefing and oral argument in this case, the applicable policy was amended. I agree with the majority that, for purposes of this assignment of error, we should limit our review to the policy as it existed from when appellant arrived at the confinement facility in March 2016 until the policy was amended in November 2018.

Unlike the majority, however, I would specifically apply the *Turner* factors to determine whether the policy constituted a legal deficiency in appellant's post-trial confinement conditions. When considering these factors, courts accord "substantial deference to the professional judgment of prison administrators." *Beard v. Banks*, 548 U.S. 521, 528 (2006) (quoting *Overton*, 539 U.S. at 132). However, "a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89-90. Further, the prison regulations cannot represent an "exaggerated response" to a security objective. *Id*. at 97-98.

In weighing the *Turner* factors in this case, I find they overwhelmingly favor appellant.

The first *Turner* factor, whether the regulation has a valid rational connection to a legitimate governmental interest, is admittedly a close call. The government put forth two objectives for the challenged policy: (1) the safety of children; and (2) rehabilitation of the offender. Both of these objectives are clearly valid penological and governmental interests. I also do not find either rationale remote. I am, however, concerned that the policy represented an "exaggerated response" to the stated objectives.

Unlike similar policies in other cases, the challenged policy precluded all forms of contact to include indirect contact. *See Overton*, 539 U.S. at 133-35 (biological children allowed to visit and inmate can speak with nieces and nephews by phone or mail); *Pell v. Procunier*, 417 U.S. 817, 824-25 (1974) (inmates permitted to, among other things, communicate with those who cannot visit by sending messages through those who can visit). Furthermore, appellant can sit in close proximity of other inmates' children, but he cannot sit in close proximity to his own children.[18] Under the facts of this case, I find the MCC policy represented an exaggerated response.

The second *Turner* factor, whether there are alternate means open to exercise the right, also weighs against the government. Critically, in analyzing this factor in *Overton*, the Court stated, "Alternatives to visitation need not be ideal . . . they need only be available. Here, the alternatives are of sufficient utility that they give some support to the regulations, particularly in a context where visitation is limited, not completely withdrawn." 539 U.S. at 135. On the other hand, the Court stated, "Were it shown that no alternative means of [exercising the circumscribed right] existed . . . it would be some evidence that the regulations were unreasonable." *Id*.

Here, visitation was completely withdrawn and the government did not put forth any alternative means of contact. Instead, the government argues that an inmate had the alternative of admitting guilt, completing a sex offender treatment program, and then submitting a request for an exception to policy. The government emphasized that regardless of completing the program, an exception to policy may not have ever been granted. I find the combination of the amount of time this alternative would take and the speculative nature of whether an inmate would ever be able to receive an exception renders this a false alternative. Requiring an exception to policy is not demonstrating that the policy has an alternative; on the contrary, it is an acknowledgment that no alternative existed.

In its brief, the government put forth a second alternative: that appellant could contact his children through their adult mothers. The government cites *Samford v.*

---

[18] Given appellant's conviction for sexual assault of a friend's thirteen-year-old daughter, this seems counterproductive to the facility's goal of protecting children.

*Dretke* for the proposition that this form of indirect contact suffices. 562 F.3d 674, 680-681 (5th Cir. 2009). Even assuming such contact would suffice, this argument fails because appellant was permitted neither direct *nor indirect* contact with his children. In fact, if appellant attempted to use this purported alternative, he would have been in violation of the regulations and subject to administrative action.

The third *Turner* factor, what impact an accommodation of the right would have on guards and inmates and prison resources, weighs against the government. While a complete reversal of the challenged policy would potentially have a significant impact on the guards and prison resources, allowing an inmate to send or receive letters does not appear to add substantially to the burden of the correctional facility.

For the final *Turner* factor, we look to see if there are reasonable alternatives which accommodate appellant's request at a de minimis cost to the valid penological goal. This factor again weighs against the government. Appellant put forth telephone calls or letters as reasonable alternatives. The government argues that these would have more than a de minimis impact on the goals of safety and rehabilitation. Such an argument remains unpersuasive, particularly in light of the analyses in several cases upholding limitations on contact policies after finding that either telephone calls or letters were reasonable alternatives which precluded the conclusion that the policies in those facilities overreached.[19]

I agree with the majority that our court does not have the authority to dictate MCC policies. Instead, our authority is limited to ensuring appellant's sentence is appropriate. So the question becomes how the MCC policies play into our sentence appropriateness review. By abstaining from answering this question, the majority: (1) adopts an unnecessarily restrictive view of Article 66(c); and (2) fails to appreciate the effect of its abstention when addressing sentence appropriateness and post-trial delay.

---

[19] *See, e.g., Overton*, 539 U.S. at 135; *Wirsching v. Colorado*, 360 F.3d 1191, 1200-01 (10th Cir. 2004) (appellant's ability to "maintain contact with his children through means other than visitation supports the reasonableness of the CDOC policy"); *Simpson v. Cty. of Cape Girardeau*, 879 F.3d 273, 280-81 (8th Cir. 2018) (appellant could send postcards and receive collect calls as part of "alternative means of communication"); *Royer v. Fed. Bureau of Prisons*, 933 F. Supp. 2d 170, 186 (D.D.C. 2013) (appellant retained right to make phone calls, write letters, and have noncontact visits); *Vega v. Tegels*, 2018 U.S. Dist. LEXIS 118801, at *18 (W.D. Wis. July 17, 2018) ("[D]efendants have provided plaintiff with other means of communication, including unlimited phone calls, messaging, and mail.").

First, in failing to determine whether a constitutional error exists in this case, the majority adopts an unnecessarily restrictive view of Article 66(c). For example, in *White*, the concurring judge stated the opinion "squarely held" that "the lower courts have *the duty* . . . to review whether the sentence imposed by a court-martial is being unlawfully increased by prison officials." 54 M.J. at 475 (Sullivan, J., concurring) (emphasis added).

While this duty will normally relate to assessing alleged violations of Article 55 and the Eighth Amendment, it may also arise in other unique contexts. As our sister court recently stated, "Only in very rare circumstances do we anticipate granting sentence relief when there is no violation of the Eighth Amendment or Article 55, UCMJ." *United States v. Ferrando*, 77 M.J. 506, 517 (A.F. Ct. Crim. App. 2017). This case presents such circumstances. Appellant provided ample documentation to support his First Amendment claim, and I believe we should address this error and weigh its effect on sentence appropriateness.[20]

Second, the majority fails to appreciate the effect of its abstention. More specifically, by failing to address the alleged error, the majority conducts a flawed review of sentence appropriateness and post-trial delay. Critically, while the majority assumed the *facts* underlying the first alleged error, it did not analyze the alleged error itself. The difference matters, particularly in the context of sentence appropriateness.

For example, a service court could find that the post-trial confinement conditions – when exacerbated by dilatory post-trial processing – change appellant's sentence from one that is appropriate to one that is inappropriately severe. Put another way, an individual error may not warrant the same relief as its cumulative effect. Notably, in *Gay*, our sister court concluded the sentence was inappropriate "on the basis of his post-trial confinement conditions *and* the government's delay in forwarding the record of trial for [its] review." 74 M.J. at 745 (emphasis added).

Furthermore, in conducting a due process analysis for post-trial delay, one of the relevant sub-factors for prejudice is "directly related to the success or failure of

---

[20] I have also considered whether we are required to remand this case for a *DuBay* hearing. I agree with the majority that no post-trial hearing is necessary, though for different reasons. When applying the factors outlined in *United States v. Ginn*, no hearing is required if the government does not contest the relevant facts. 47 M.J. 236, 248 (C.A.A.F. 1997). Here, the government did not dispute the relevant facts and agreed the policy deprived appellant of an opportunity to have contact with his children unless he received an exception to policy. Additionally, in one of its briefs, the government expressly stated there were no substantial contradictions between its appellate exhibits and appellant's.

an appellant's substantive appeal," since "[i]f the substantive grounds for the appeal are not meritorious, an appellant is in no worse position due to the delay." *United States v. Moreno*, 63 M.J. 129, 139 (C.A.A.F. 2006) (citation omitted). Under such circumstances, it becomes even more important to carefully analyze the validity of an appellant's substantive claims. The majority, however, elected to abstain and then did not provide any analysis of the effect of its abstention.

Finally, the MCC policies present several unique considerations related to post-trial delay. One is that an appellant's ability to make choices on whether and when to waive his right to self-incrimination can be impacted by the state of his appeal. As such, any post-trial delay has a potential impact on an appellant's choices and when his assignments of error will be considered by this court. At a minimum, these are valid considerations in determining whether relief is warranted under Article 66(c). *See United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002) (CCAs can grant relief for post-trial delay without material prejudice if relief is "appropriate under the circumstances.").

In sum, we should address both alleged errors when conducting our sentence appropriateness review in this case. To this extent, I would find that the post-trial confinement conditions and dilatory post-trial processing change appellant's sentence from one that is appropriate to one that is inappropriately severe.[21]

*Conclusion*

Over thirty years ago, our court stated, "The Supreme Court's approach in *Turney v. Safley* may be paraphrased as follows: A court *should inquire* whether a particular restriction or condition that burdens a prisoner's rights is 'reasonably related' to legitimate penological objections, or whether it represents an 'exaggerated response' by the prison authorities to those concerns." *United States v. Austin*, 25 M.J. 639, 642 n.3 (A.C.M.R. 1987) (emphasis added).

I believe we should follow this advice and therefore I dissent.

---

[21] The majority would have it too difficult to determine an appropriate sentence. Yet that is what Article 66(c) mandates we do in every case. I see no reason why we cannot "bring to bear [our] wisdom, experience, and expertise" in determining an appropriate sentence. *United States v. Hutchison*, 57 M.J. 231, 234 (C.A.A.F. 2002).

JESSIE—ARMY 20160187

Judge HAGLER, joined by Chief Judge BERGER, dissenting:

I join Judge Schasberger's dissent and would affirm the findings while reducing the sentence. I write separately to comment on the MCC policies (i.e., MCC SOP 310 and JRCF Regulation 600-1) and the majority opinion.

It is true this court has no directive authority over the MCC, and we cannot grant injunctive relief, yet that does not mean we should give tacit approval to poorly justified policies that continue to violate appellant's constitutional rights. While we do not have "unlimited authority . . . to grant sentence appropriateness relief for any conditions of post-trial confinement of which [we] disapprove," this case presents the exact type of "legal deficiency in the post-trial process" that authorizes relief under Article 66(c). *United States v. Gay*, 75 M.J. 264, 269 (C.A.A.F. 2016). Not only do the previous MCC policies on inmate contact fail the *Turner* criteria (two of these are epic fails, in my view), they were also administered in a manner that made them both inflexible and arbitrary.

First, the government offers no convincing, or even reasonable, explanation why the MCC needs policies that, to my knowledge, are more restrictive than any other federal or state jurisdiction. I have not found any case addressing a policy that, among other things: (1) bans all direct and indirect contact with a non-victim biological child, when the child's custodian approves the requested contact; (2) requires admission of guilt as a precondition to sex offender treatment; and (3) requires treatment that may take years to complete before even requesting an exception to the policy (ETP).[22]

While we must give "substantial deference to the professional judgment of prison administrators," such deference is not wholly unfettered. *Beard v. Banks*, 548 U.S. 521, 528 (2006) (quoting *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)). In fact, it is difficult to defer to the judgment of prison officials on a policy that purports to be in the best interest of children and an inmate's rehabilitation, when in practice, they take neither of these into account on an individualized basis. Of course, "protection of children" and "rehabilitation of inmates" are valid penological interests, but simply invoking these phrases provides no rational basis for why the MCC draws the line where it does, or why these interests should apply differently

---

[22] The cases cited by the government are readily distinguishable. In *Mondonedo v. Roberts,* the policy *did* allow sex offenders mail and phone contact with their "children or immediate family members," as long as no such children or family members were a victim. 2013 U.S. Dist. LEXIS 35178, *2 (D. Kan. March 14, 2013). In *Fuller v. Werholtz*, the plaintiff challenged whether he should be classified as a sex offender under the policy, not whether the policy violated his right to familial association. 2005 U.S. Dist. LEXIS 48368 (D. Kan. July 11, 2005).

within military facilities. Similarly, the MCC claimed its challenged policies align with ATSA standards and guidelines, and that it evaluates contact with children on an individual basis, but this does not mean the MCC's policy and practice actually do so. The documents before this court clearly show otherwise. Simply put, the walk does not match the talk.

Second, the policies provide no alternative means of contact. In my view, *Overton* was very clear on this point: "Alternatives to visitation need not be ideal . . . they need only be available." 539 U.S. at 135. Here, none are. The MCC approach is simple: child sex offenders can have no contact—in-person, telephonic, or written, direct or indirect—with children. Thus, the "alternative" proposed in the government's brief (i.e., contact through the child's mother) is expressly prohibited by the MCC policy. The government's claim that this policy provides another alternate means—namely, requesting an ETP—is dubious at best.[23] Under the terms of the challenged policy, a request for ETP will not be considered until an inmate admits responsibility and completes sex offender treatment.[24] According to the affidavits provided by MCC personnel, appellant remains ineligible for such treatment due to[25] his "denial of his contact sexual offenses and statements of victim blaming and questioning the victim's creditability [sic]."

In practice, appellant's experience shows the process to obtain an ETP is as inflexible as the policy itself. Appellant filed an MCC Form 510, requesting "information for exception of policy. I am asking if and when I can see my chidren [sic]." In response, appellant was informed, "You are not currently eligible for sex

---

[23] The idea that an exception to policy is, in fact, the key protection provided by the policy is "doublethink" worthy of George Orwell's *Nineteen Eighty-Four*. It is even more problematic that the decision to grant an exception is completely discretionary and the overall policy remains—in the majority's view—not suitable for review by this court.

[24] The government submitted a revised MCC SOP 310 (with an effective date well after oral argument in this case), which allows an inmate to submit a request for ETP before completing the treatment. After reviewing the SOP, however, I remain convinced it allows appellant no alternative means of contact that would satisfy *Turner*. First, the SOP does not say appellant would be eligible to begin treatment without first admitting guilt—a precondition noted in the MCC's own affidavits. Second, it is not apparent how a unit SOP signed by a chief of staff affects JRCF Regulation 600-1, which still expressly prohibits all direct and indirect contact. Thus, the SOP revision appears to have no impact on appellant's situation and the viability of any alternative means of contact available to him.

[25] Corrected

offender treatment as you do not take responsibility for your confining offense." Later, in response to an Article 138 complaint, appellant's commander informed him the request was "inappropriate" because he could apply for an ETP—for which he was previously told he was ineligible. I cannot view this process as a viable alternative means to exercise what the Supreme Court has recognized as a constitutional right.

Despite the majority's implication, our position is not an attempt to effect policy change or to dictate the most "appropriate" prison policy. We have only reviewed the policy, as applied to appellant, under the prevailing legal standard. This is routine practice for our court. The majority's hesitancy to address the matter is even more perplexing based on the clear framework of the *Turner* factors. Simply put, we have the test. We need only apply it. On this point, I note that our sister courts have capably applied the *Turner* factors in cases involving prison policies and regulations. *See United States v. Green*, ACM 36664, 2007 CCA LEXIS 475, at *6-12 (A.F. Ct. Crim. App. 12 Oct. 2007); *United States v. Felicies*, NMCCA 9900206, 2005 CCA LEXIS 124, at *36-41 (N-M. Ct. Crim. App. 27 Apr. 2005). We should join them.

Finally, I recognize the majority's apparent concern with flooding the appellate process with complaints of post-trial confinement conditions, but I cannot accept it as a justification for inaction in this case. Given the legal deficiency of the MCC policy, we have the authority to grant sentencing relief. This relief would be meaningful as it would allow appellant an earlier opportunity to exercise a right the MCC's policy continues to deny him. If our consideration of post-trial submissions in this case increases the frequency of similar complaints, so be it. The sky will not fall. It is a sad day for justice when this court is presented with strong evidence of a constitutional infringement yet declines to address it—not because we find no prejudice or lack authority to grant meaningful relief—but because we fear the consequences. Even if such consequences do come to pass, I would still fulfill our statutory duty. *Fiat Justitia Ruat Caelum*.

FOR THE COURT:

JOHN P. TAITT
Acting Clerk of Court